[Civil No. 744.   Filed March 23, 1901.]

[64 Pac. 494.]

## THOMAS P. BIGGS et al., Plaintiffs and Appellants, v. THE UTAH IRRIGATING DITCH COMPANY et al., Defendants and Appellees; ELWOOD HADLEY, United States Indian Agent, Intervener and Appellant.

1. WATER AND WATER-RIGHTS—IRRIGATION—UNINCORPORATED ASSOCIATION—MEMBERS—STATUS—TENANTS IN COMMON.—The *status* of the members of an unincorporated irrigating ditch company, in so far as the dam and ditch, the property of the association, is concerned, is that of tenancy in common.

2. SAME—SAME—SAME—TITLE TO DITCH—APPROPRIATION.—There is a clear distinction between the property of an unincorporated irrigating ditch association, which consists of the dam and ditch, and which is held in common by the members of the association, and the right of appropriation which each member thereof has by virtue of being the owner or possessor of land irrigated by water from the river by means of such dam and ditch.

3. SAME—SAME—SAME—CERTIFICATES OF STOCK—CONTRACTS — APPROPRIATION—TRANSFER.—Where an unincorporated irrigating ditch company issued to its members certificates which were treated by the members as evidencing their titles to the dam and ditch the property of the association, their right to a voice in the management and control of the property, and also the amount and extent of the appropriation of water by each, or at least as evidencing the measure of their right in times of scarcity, such certificates are evidences of the contract between the several members constituting the association, not only as to the ditch and dam, but as to the distribution of the water diverted thereby, and the sale and alienation thereof is in effect a conveyance not only of the interest in the dam and ditch but as well the water-right owned and possessed by the original holder thereof.

4. SAME—SAME—SAME—SAME—APPROPRIATOR—PRIORITY—GOVERNS IN ABSENCE OF CONTRACT — WATER-USERS UNDER A COMMON DITCH MAY CONTRACT AMONG THEMSELVES AS TO METHOD OF SERVICE.— Independent of any statutory provision upon the subject, wherever the right of prior appropriation of water is recognized and enforced, each appropriator of water under a ditch, whether such ditch be held in common or owned by a corporation, is entitled, in the absence of a contract between the owners of the ditch, to be supplied in the order of his priority of appropriation. But this right is a property right and one which may be the subject of contract, and there is no statute in this territory which prevents

appropriators of water by means of a common ditch from agreeing among themselves as to the manner in which they may enjoy their several appropriations.

5. SAME—SAME—SAME—PRIORITY—ACCORDING TO OLDEST TITLES LIMITED TO PUBLIC DITCHES—PRIVATE DITCHES—PRIORITY DETERMINED BY APPROPRIATION AND USE—REV. STATS. ARIZ. 1887, PARS. 3201, 3215, 3223, CONSTRUED.—Paragraph 3215, *supra,* providing that the oldest land titles shall have precedence always in the use of water in times of scarcity, in its strict application must be limited to public ditches. Paragraphs 3201, 3215, and 3223 together, so far as private ditches are concerned, are to be construed as declaring that not mere priority of diversion, but priority of use and appropriation of water upon particular lands, shall govern in determining conflicting rights.

6. SAME—SAME—SAME—MEMBERS—APPROPRIATION—SALE—CHANGE OF USE—APPLICATION OF WATER TO LAND OTHER THAN THAT FOR WHICH ORIGINALLY APPROPRIATED—REV. STATS. ARIZ. 1887, PARS. 3201, 3215, 3223, CONSTRUED.—The statutes, *supra,* while recognizing the ownership and possession of land as essential to the acquisition and enjoyment of a water-right for purposes of irrigation, and while limiting its use to the particular lands to which it is attached, do not deny the right of alienation and the transfer of such right from one particular tract of land to another, except under the limitations that the transferee is of the class of persons entitled to make a valid appropriation by virtue of being the owner or possessor of arable and irrigable land, and that such change does not injure another having rights which have accrued at the time of such transfer and change of use.

7. SAME—SAME—SAME—SAME—ESTOPPEL—DALTON V. RENTARIA, 2 ARIZ. 275, 15 PAC. 37, CITED.—Where certain holders of certificates in an unincorporated ditch company, which represented an interest in the ditch and water diverted thereby, sold such certificates to persons who located under an extension of the canal, and these transferees up to the time of the commencement of the suit, being from eight to sixteen years, with the acquiescence of the other holders of certificates, have enjoyed the same use of water, and the same equal division in times of scarcity, and have reclaimed and cultivated lands under the belief that they had an equal right to water, those who retained their certificates and original holdings are thereby estopped from asserting a priority of right in themselves.

8. SAME—SAME—PRESCRIPTION.—Where certain Indians acquired rights to water from a canal by labor in the construction and maintenance of the canal, without becoming shareholders, and have been accorded such rights for twenty years or more, those rights are in their nature prescriptive, and a judgment apportioning them water in accordance with the amount shown to have been used, upon

condition that they shall perform labor and contribute a proportionate amount toward the expense of maintenance, as they have been accustomed to do, is not unreasonable or erroneous.

APPEAL from a judgment of the District Court of the Third Judicial District in and for the County of Maricopa. Webster Street, Judge.    Affirmed.

The facts are stated in the opinion.

W. H. Stilwell, and E. W. Lewis, for Appellants.

Paragraph 3199 of the Revised Statutes of Arizona provides: "All rivers, creeks, or streams of running water are hereby declared public, and applicable to the purposes of irrigation and mining as hereinafter provided." A mere diversion of water does not constitute an appropriation. *Clough* v. *Wing,* 2 Ariz. 371, 17 Pac. 453; *Farmers' High Line Canal Co.* v. *Southworth,* 13 Colo. 111, 21 Pac. 1028; *Schilling* v. *Rominger,* 4 Colo. 109; *Thomas* v. *Gueiana,* 6 Colo. 553; *Sieber* v. *Frink,* 7 Colo. 149, 2 Pac. 901; *Wheeler* v. *Irrigation Co.,* 10 Colo. 582, 3 Am. St. Rep. 603, 17 Pac. 487.

Appropriation of water consists in the intention, accompanied by reasonable diligence, to use the water for the purpose originally contemplated at the time of diversion. *Offield* v. *Ish,* 21 Wash. 277, 57 Pac. 809.

The right to the use of water is the essence of appropriation; the means by which it is done is incidental. *Offield* v. *Ish,* 21 Wash. 277, 57 Pac. 809.

An appropriator of water from a stream already partly appropriated acquires right to the surplus or residue appropriated. *Colorado Milling Co.* v. *Larimer Irr. Co.,* 26 Colo. 47, 56 Pac. 185.

Because in such case each, with respect to his particular appropriation, is prior in time and exclusive in right. *Water Co.* v. *Powell,* 34 Cal. 109, 91 Am. Dec. 685.

Appropriation is a right collateral to right under contract. *San Diego Land etc. Co. of Maine* v. *Sharp,* 97 Fed. 394.

It is not determined by the size, but by the amount actually applied to beneficial use. *Millheiser* v. *Long,* 10 N. Mex. 99, 61 Pac. 113.

In Arizona, as in New Mexico, where was decided the case last cited, priority of appropriation must govern, and water-

rights must be determined by it. The case just referred to is from the supreme court of New Mexico, and embraces a full discussion of the question of appropriation and the acts necessary to establish same. No other state or territory embracing any of the arid portions of the United States can be said to stand so nearly in the position of Arizona regarding the question of public waters as does the territory of New Mexico. *United States* v. *Rio Grande etc. Co.,* 174 U. S. 690, 19 Sup. Ct. Rep. 770.

The consumer, by reason of his application of the water to a beneficial use, is said to be an appropriator. *Wright* v. *Platte Valley Irr. Co.,* 27 Colo. 322, 61 Pac. 603.

An actual diversion and use is necessary to complete an appropriation. One of the essential elements of a valid appropriation of water is the application thereof to some useful industry. To acquire a right to water from diversion thereof one must within a reasonable time employ the same in the business for which the appropriation is made. *Sieber* v. *Frink,* 7 Colo. 148, 2 Pac. 903; *Ophir M. Co.* v. *Carpenter,* 4 Nev. 534, 97 Am. Dec. 550; *Kelly* v. *Natoma Water Co.,* 6 Cal. 105.

When rights for appropriation are once vested, they must be held and protected, unless abandoned. *Malad Valley Irr. Co.* v. *Campbell,* 2 Idaho, 411, 18 Pac. 52; *De Necochea* v. *Curtis,* 80 Cal. 397, 20 Pac. 563, 22 Pac. 198.

When the taking and appropriation are plain, yet the use is held to be an individual right. *Tenem Ditch Co.* v. *Thorp,* (Wash. Ty.), 20 Pac. 588.

And this was subsequent to the incorporation of the ditch interests by the tenants in common.

Said the court in the case of *Power* v. *Switzer,* 21 Mont. 523, 55 Pac. 32: "It has been a mistaken idea . . . that he who has diverted or 'claimed' and filed a claim of water for any number of given inches has thereby acquired a valid right, good as against all subsequent persons. It is only when diversion is accompanied by application to some beneficial use that water is appropriated so as to prevent a subsequent appropriator from acquiring its use."

In *Millheiser* v. *Long,* 10 N. Mex. 99, 61 Pac. 113, the court says: "Diversion without application to beneficial use is simply turning water . . . into a new channel and creating

a monopoly. Water of a stream does not belong to the party diverting it alone. Then there would be but one appropriator and all others upon such stream must pay tribute to the person making the first diversion. This,'' said the court, ''is not law covering water-rights in this territory [New Mexico], where the waters of natural streams are declared to be free to those who apply them to a beneficial use until all are thus appropriated.''

Diversion of water not consumed must be returned. *Weiss* v. *Oregon etc. Co.,* 13 Or. 496, 11 Pac. 255.

The transfers of certificates of defendant association, as shown by the testimony in this case, cannot be considered as a transfer of any interest in the ditch owned by the individuals owning the ditch.

The present case should be controlled by the rule laid down by the court of Utah in the case of *Lehi Irrigation Co.* v. *Moyle,* 4 Utah, 327, 9 Pac. 867, which gives to newcomers, admitted by tacit consent to the use of the ditch, the right to appropriate and convey water through the ditch for beneficial uses without deed or other evidence of conveyance of interests in such ditch, and that each increased use of water through the ditch must be taken and considered as a new appropriation thereof.

Thus the size of the ditch merely does not determine an appropriation of water, but the amount actually applied to a beneficial use. *Millheiser* v. *Long,* 10 N. Mex. 99, 61 Pac. 113.

Such amount is also the test for the size of the right of way for the ditch. *Riverside Land and Irr. Co.* v. *Jansen,* 66 Cal. 300, 5 Pac. 486.

The transfer of certificate shown by the evidence in the case cannot be considered a transfer of any interest in the water flowing in said ditch: 1. Because there is no evidence that those who parted with certificates of the defendant association had any right to the use of water in the Utah canal; 2. That there is no evidence that in the transfer of such certificates there was an intention to abandon, transfer, or dispose of any rights to the use of water in the Utah canal; 3. That a sale of water, or diversion of water for sale, in the territory of Arizona is not a beneficial use. Act of Congress March 3, 1891; *San Diego County* v. *Sharp,* 97 Fed. 399; *Manning* v. *Fife,* 17 Utah, 232, 54 Pac. 111.

A diverter of water cannot give away or dispose of any surplus waters to the injury of subsequent appropriators. *Manning* v. *Fife,* 17 Utah, 232, 54 Pac. 111; *Creek* v. *Waterworks Co.,* 15 Mont. 121, 38 Pac. 459; *Nichols* v. *McIntosh,* 19 Colo. 22, 34 Pac. 278; *Barnes* v. *Sabron,* 10 Nev. 217; Kinney on Irrigation, sec. 231; *Hague* v. *Irrigation Co.,* 16 Utah, 421, 67 Am. St. Rep. 634, 52 Pac. 765; *Frank* v. *Hicks,* 4 Wyo. 502, 35 Pac. 475, 1025; *Millheiser* v. *Long,* 10 N.. Mex. 99, 61 Pac. 117.

Baker & Bennett, and Joseph Campbell, for Appellees.

It would be inequitable and unjust to deprive these defendants of this water and give it back to the settlers upon the original twenty-four quarter-sections. Especially when these settlers on the twenty-four quarter-sections sold a large portion of their shares for large sums of money, and for more than twelve years permitted the water of the canal to be distributed *pro rata* per share to the shareholders, and allowed these vendees to yearly contribute to the keeping up and maintaining of said canal and dam. *Bloom* v. *West,* 3 Colo. App. 212, 32 Pac. 846; *Oppenlander* v. *Left-Hand Ditch Co.,* 18 Colo. 142, 31 Pac. 854; *Nichols* v. *McIntosh,* 19 Colo. 22, 34 Pac. 278; *Larimer and Weld Co.* v. *Cache La Poudre Co.,* 8 Colo. App. 237, 45 Pac. 525; *Wyatt* v. *Larimer and Weld Irrigation Co.,* 1 Colo. App. 480, 29 Pac. 906; *Nevada Ditch Co.* v. *Bennett,* 30 Or. 59, 60 Am. St. Rep. 777 and note, 45 Pac. 472.

Robert E. Morrison, U. S. District Attorney, and Thomas D. Bennett, Assistant U. S. District Attorney, for Intervener.

SLOAN, J.—The essential facts in this cause which appear from the record are as follows: In the year 1877, twenty-four families emigrated from Utah, and settled upon twenty-five quarter-sections of public land, lying on the south side of the Salt River, near what is now known as the "Village of Mesa," in Maricopa County. During the same year, the people composing this little colony constructed a dam and ditch for the purpose of diverting and conveying from the Salt River water for the reclamation and irrigation of the lands held by them. The ditch thus constructed had a carrying capacity

of twenty-five hundred inches, miners' measurement, and was named and known thereafter as the "Utah Irrigating Ditch." Soon after the completion of the dam and ditch the occupants and possessors of the twenty-five quarter-sections of land organized an association, and adopted rules and by-laws governing the same, for the purpose of controlling, caring for, and managing the affairs of the Utah irrigating ditch, and to provide for the proper distribution of water to the lands held by them from the said ditch. The association was named, and has ever since been known as, the "Utah Irrigating Ditch Company." The company issued to each of its members, as an occupant of one of the said quarter-sections of land, a certificate of membership as an evidence that each holder of such certificate was entitled to participate as a member of said association. Under the rules and regulations, and in accord with the original intent of the builders of the canal, the water diverted by means thereof was apportioned among the holders of the certificates upon the basis that each holder of a certificate was entitled to one twenty-fifth part of the whole. During the year 1879 the president of the United States set apart, for the use and benefit of certain Indians, seven quarter-sections of public land lying under said ditch, and, in consideration of said Indians performing labor and work upon the ditch, the members of the Utah Irrigating Ditch Company granted to said Indians the right to the use of the ditch, and permitted them to take water from the said ditch for the irrigation of the land so set apart and held by them, and thereafter recognized the right of said Indians to an interest in said ditch; but no certificates were issued to them, nor were they permitted to participate in the proceedings and deliberations of the association. During the year 1882 the Utah ditch was enlarged, and seven individuals holding land under the ditch, and who were not members of the original association, were granted certificates, thus making the total number of certificates thirty-two instead of twenty-five, and these holders of these additional certificates were permitted to participate in the affairs of the association, and to enjoy the use of said ditch and the water flowing therein, to the same extent, and upon the same terms, as the holders of the original certificates. In the year 1883 the association recalled the certificates of membership theretofore issued, and issued in

their place, instead, one hundred and twenty-eight certificates, being four certificates for each original certificate, and gave to the holder of each of the latter certificates one vote in the proceedings of said association. The effect of this was to subdivide the certificates upon the basis of one to each forty acres, instead of one to each one hundred and sixty acres, as originally provided. During the year 1887 certain occupants and possessors of land upon what is known as the "Mesa," lying to the south and west of the lands occupied by the builders of the Utah ditch, organized what was known and called the "Alamo Irrigating Ditch Company." The latter company entered into an agreement with the Utah Irrigating Ditch Company by the terms of which the former was permitted to enlarge and extend the Utah ditch so as to permit the diversion of water from the Salt River and the carriage of the same to the lands held by members of the Alamo Irrigating Ditch Company. It was agreed between the two companies that the water which might flow in the ditch after the enlargement and extension of the same should be divided in the following manner: The Alamo Irrigating Ditch Company was to have the right to six sixteenths of the entire amount of water in the enlarged ditch, except that the Utah Irrigating Ditch Company should at all times have the right to the use of three thousand inches of water at times when ten sixteenths of the entire amount flowing in said canal should not approximate that amount; that is to say, the division of the water upon the ratio of six sixteenths to the Alamo Company and ten sixteenths to the Utah Ditch Company was to be had only at such times when the ten sixteenths would amount to three thousand inches of water. At all other times the Utah Ditch Company was to enjoy the prior right to the use of the water flowing in the canal, to the amount of three thousand inches. It appears from the evidence that, after the increase in the number of certificates of membership in the Utah Company was enlarged from thirty-two to one hundred and twenty-eight, many of the holders of these certificates sold or assigned a part of them to persons who had settled upon lands upon the Mesa, and under the extension of the canal made by the Alamo Company, and that ultimately sixty of these certificates had been so sold and assigned. It also appears that from the time when these transfers were first made, beginning with the

year 1887 and extending down to the year 1899, the holders
of these assigned certificates participated in the affairs of the
Utah Irrigating Ditch Company, and enjoyed all the rights
in the use of water from the ditch held and enjoyed by the
original holders who occupied the lands first irrigated from
the ditch; that is to say, the water flowing in the ditch during
times of scarcity was divided *pro rata* among the holders of
the one hundred and twenty-eight certificates, without regard
to whether the lands irrigated constituted the original twenty-
five quarter-sections, or were lands subsequently located and
taken up upon the Mesa. No question was raised as to the
right of the holders of the Mesa lands who were holders of
the Utah Irrigating Company's certificates to the use of water
flowing in said ditch upon an equality with the holders of
the certificates who held and possessed lands under the orig-
inal ditch, until the year 1899, when the plaintiff Thomas
P. Biggs and thirteen other persons, certificate-holders and
the owners of land under the original ditch, brought this suit
against the Utah Irrigating Ditch Company, Jedediah John-
son, William M. Dobson, and Edward E. Jones, as directors,
and Thomas E. Jones, water master, and H. C. Rogers, James
Johnson, John S. Watrous, and E. E. Jones, for the purpose
of having declared that the owners of the lands first cultivated
under the Utah ditch were entitled to a preference over the
owners of the lands under the extension to the use of water
diverted by the canal during seasons of scarcity, and to enjoin
the Utah Irrigating Company and its officers from diverting
from said lands of plaintiffs to the Mesa lands water during
said seasons of scarcity. The theory upon which plaintiffs
brought their suit was that the lands originally irrigated from
the Utah ditch possessed a prior right of appropriation over
the lands subsequently taken up and reclaimed under the
extension. The answer put in by the defendants to the com-
plaint set up that, after the issuance of the one hundred and
twenty-eight certificates in lieu of the original thirty-two,
many of the holders, among whom were some of the plaintiffs,
sold, assigned, and transferred certificates held by them to
certain persons, who thereby became members of the associa-
tion, and who upon said purchases, with the knowledge and
consent of the vendors, ever since the year 1883, have applied
upon the lands held and owned by them the *pro rata* amount

of the water called for in said certificates, to wit, the one one hundred and twenty-eighth part; that at the time said assignments of said certificates were made the said vendors thereof represented to said vendees that, by virtue of the ownership of said shares, the holders thereof were entitled to receive from said canal a *pro rata,*—to wit, one one hundred and twenty-eighth part,—of the water flowing therein for each share in said canal; that upon the strength of such representations, and for no other reason, said purchases were made, and said vendees thereafter expended large sums of money in preparing their land for cultivation, building improvements thereon, and in settling upon the same; that there is no other means of conveying said water upon said lands except through and by said Utah canal. Upon the filing of the complaint, Elwood Hadley, as United States Indian agent, was permitted to intervene in the action in behalf of the Indian holders of land under the Utah canal, and who had been users of water from the same. The cause was heard by the court, and judgment rendered for the defendants as against the plaintiffs, dismissing the action.

Upon the complaint in intervention, the court entered the following decree: "That there be apportioned and delivered to the interveners, the Pima and Maricopa Indians, by their agent duly appointed by the United States, a sufficient amount of water to irrigate their lands in sections 35 and 36, not to exceed 1/10 part of the water flowing in the Utah irrigating canal, for distribution to the holders of shares or water-rights in the said Utah irrigating canal, for the use of said Indians in the irrigation of the lands occupied by them irrigable from said canal, upon condition that the said Indians perform 1/10 part of the work and labor and pay 1/10 part of the necessary expense incurred and paid by the said Utah Irrigating Canal Company in the maintenance of the said Utah irrigating canal and the said dam by means of which the water from the said Salt River is diverted into said canal." From the judgment dismissing the complaint the plaintiffs have appealed, and from the decree above recited, entered upon the issues raised by the intervener, said intervener has appealed to this court.

The assignments of error made by the appellants are numerous. Many of these pertain to rulings of the court, made

during the trial of the cause, in the rejection or admission of evidence over the objections of appellants. Others pertain to the alleged errors in the findings of the court, and in the conclusions of law drawn therefrom, while the remainder attack the judgment of the court as not being supported by the facts and findings. Such of the assignments as pertain to the admission or rejection of evidence need not be considered, for the reason that they concern matters which are not determinative of the rights of the plaintiffs. Our examination of the record shall therefore be restricted to the consideration of the findings and judgment dismissing plaintiffs' complaint, and to the inquiry as to whether, under the settled rules of this court, these findings are sufficiently supported by the evidence, and as to whether they support the judgment.

The findings of the court which we shall consider, and which we regard as important, are these: "(3) That in the year 1882 said Utah canal was enlarged, and seven additional shares, or water-rights, were issued by said organization to the parties making such enlargement, and were numbered from 26 to 32, inclusive; that in the year 1883 said original thirty-two certificates were divided into four parts, and new certificates were issued to the number of one hundred and twenty-eight, and were delivered to the holders of the original thirty-two shares; that this was done by said association with the knowledge and consent of all the members thereof. (4) That from the time the canal was first constructed, and water carried therein, continuously up to the date of the commencement of this suit, the water flowing in said canal was distributed to the members of said organization who were holders of said certificates or shares, *pro rata,* according to the number of shares held by each. (5) That many of the holders of the original thirty-two shares, subdivided into one hundred and twenty-eight since said subdivision was made, sold and transferred some of said shares, and the interest in said canal and the water flowing therein, represented thereby, to parties other than the occupants of the aforesaid twenty-five quarter-sections, and with the knowledge and consent of said vendors said parties applied the water derived from said shares upon lands owned and occupied by said vendees other than said original twenty-five quarter-sections, and by means of the water derived from the ownership of said shares in said canal

have for many years, varying from eight to sixteen years, irrigated and cultivated said lands, and have made valuable improvements thereon, and have built houses for themselves and their families, thereon reside, and which they now cultivate.''

It is admitted in the pleadings that the original settlers upon the twenty-five quarter-sections of land held their water-rights in the Utah ditch as co-appropriators, having equal rights to the use of water appropriated by means of the canal to the extent of their needs. It also appears, not only from the pleadings, but also from the testimony put in by the plaintiffs, that after the organization of the Utah Irrigating Ditch Company, and the issuance of the original certificates, each holder thereof was regarded by the other holders as owning a one twenty-fifth part in the dam and ditch, and as entitled to a one twenty-fifth part of the water diverted by means thereof in the irrigation of his quarter-section of land. It is also shown by the evidence that after the first enlargement of the canal, and the issuance of the seven additional certificates, no distinction was made between the holders of the latter and the holders of the former certificates in the use and distribution of water and in the management and control of the canal; the latter holders having been accorded the same rights as the original holders. Each must therefore be considered a tenant in common in the ownership of the ditch, and a co-appropriator of water with the others, and therefore no question of prior appropriation can now be raised as between the holders of these original thirty-two certificates, unless the law be, as contended for by counsel for appellants, that the statutes of the territory regulating water-rights are to be construed as conferring upon the first user of water from a common source against a subsequent user, notwithstanding an agreement between them, acquiesced in by both, that no priority of right shall appertain. The soundness of this contention will be considered hereafter. Thomas P. Biggs, one of the plaintiffs, testified that, after the issuance of one hundred and twenty-eight certificates in lieu of the thirty-two original certificates, each holder of a former certificate was permitted and was accorded the right of drawing one one hundred and twenty-eighth part of the water flowing in the canal for the irrigation of his land. W. A. Daggs, another witness for the

plaintiffs, also testified that the object of the association in
issuing the one hundred and twenty-eight certificates in lieu
of the thirty-two certificates was to give each person holding
a certificate a right to vote on the management of the property
of the association, and the right to say who should hold office,
and to give to each holder of a certificate the right to have
carried through the ditch water according to his *pro rata* right
to take water.   It follows from this evidence that each cer-
tificate represented an interest held by the holder thereof in
the dam and canal, and further that, by the consent and acqui-
escence of all the members, the distribution of water flowing
in the canal was made upon the basis of the holding of each
member of these certificates, rather than upon his holding of
land.   Prior to the extension of the Utah canal, in 1887, it
appears from the testimony that many of these certificates
had been sold or assigned by the holders thereof to persons
who were not the owners of the original twenty-five quarter-
sections of land irrigated by the old ditch, but that after the
extension of the canal many of these persons settled upon
lands upon what is known as the "Mesa," and reclaimed and
irrigated the same with water from the Utah ditch; that
others, about the time of the extension of the ditch and sub-
sequent thereto, purchased other certificates, and proceeded
to reclaim and irrigate land under the extension by means of
water from the Utah ditch.   It is the *status* of these holders
of certificates as appropriators of water, with regard to the
holders of the original twenty-five quarter-sections of land,
which is involved in this suit.   It is admitted by the plain-
tiffs that these holders of certificates have participated in the
management and control of the Utah Irrigating Ditch Com-
pany.   In fact, it is admitted that these holders have at times
controlled the company's affairs and elected its officers.   Their
right to thus participate in the affairs of the association has
never, and is not now, questioned.   The evidence is conflicting
as to whether these holders of certificates under the extension
of the canal were recognized by the other certificate holders
as having the right to prorate with them in the distribution
of the water during times of scarcity, the same as though
holders of the original twenty-five quarter-sections of land.
Testimony on the part of the defendants supports the finding
of the court in this regard.   In addition to this testimony, the

contract entered into between the Utah Irrigating Ditch Company and the extension company, called the "Alamo Irrigating Ditch Company," under which the extension of the Utah ditch was made, and which is dated the eighth day of October, 1887, contained the provision "that when, in consequence of the low condition of Salt River or the scarcity of water therein, the said Utah Irrigating Canal Company shall be unable, with reasonable diligence, to take from the Salt River into its canal more than the 3,000 miners' inches to which said company is first entitled, then the party of the second part, or the parties composing the same, unless they shall be interested in the Utah Irrigating Ditch Company, will not be permitted to take, hold, or use any water from the said Utah irrigating ditch." As the holders of the certificates were the only persons interested in the Utah Irrigating Ditch Company, and as none of the holders of such certificates who appear here as plaintiffs had any interest in the Alamo Irrigating Ditch Company, the language used in the contract, "unless they shall be interested in the Utah Irrigating Ditch Company," must be taken to refer to the purchasers or assignees of certificates who occupied lands apart from the original twenty-five quarter-sections, and must be construed as an acknowledgment on the part of the Utah Irrigating Ditch Company that such persons, by virtue of their ownership of such certificates, were interested as owners in the Utah Ditch Company by virtue thereof entitled to share in the distribution of the three thousand miners' inches accorded by the terms of the contract to the members of the Utah Company under their prior appropriation. Thomas P. Biggs, one of the plaintiffs, and who testified to the effect that the holders of the assigned certificates, unless holders of the original twenty-five quarter-sections of land, were not accorded the right of prorating with the latter in times of scarcity in the irrigation of their lands, was one of the signers of said contract in behalf of the Utah Irrigating Ditch Company. We think the finding of the court that the water flowing in the Utah canal was continuously, up to the date of the commencement of the suit, distributed to the members of the association who were holders of certificates, *pro rata* according to the number of shares held by each, whether the holders were owners of the original twenty-five quarter-sections of land or not, is fully sustained by the evi-

dence.   It also appears from the testimony that many of the
holders of these certificates purchased them from the original
holders, with the expressed purpose of taking up land under
the extension, and reclaiming and irrigating the same from
the Utah ditch through the extension, with the understanding
that by means of such purchases they acquired equal rights,
in the distribution of water from the Utah ditch through the
extension, with those holders of certificates who occupied the
original twenty-five quarter-sections of land, and that after
said purchases were made they proceeded to reclaim, culti-
vate, and improve the land so taken up by them, and that
until the commencement of this suit they enjoyed equal rights
in the distribution of the water with the holders of said
twenty-five quarter-sections.   The finding of the court in this
regard is likewise abundantly supported.

The Utah Irrigating Ditch Company is not an incorporated
company.   The *status* of its members, therefore, in so far as
the property of the association is concerned, is that of tenancy
in common.   One of the incidents of tenancy in common is
that a change in its membership does not affect the relations
of the tenants, and that each tenant may sell or encumber his
interest at pleasure, without regard to the knowledge, consent,
or wish of his co-tenant.   So far, therefore, as the mere prop-
erty of the association is concerned, each member had the right
to sell or assign his interest, or any portion thereof, as he saw
fit, with or without the consent of the other members, and the
purchasers of such interest or interests succeeded to all the
rights of the vendors in the property of the association.   Un-
doubtedly there is a clear distinction between the property of
the association, which consisted of the dam and ditch, and
which were held in common by the members of the association,
and the right of appropriation which each member thereof
had by virtue of being the owner or possessor of land irri-
gated by water from Salt River by means of such dam and
ditch.   The appropriation made by the members was distinct
from the means by which that appropriation was made ef-
fective.   It is conceded that the certificates issued by the
association to its members were treated from the beginning as
evidencing in the holders a right to participate in the affairs
of the association and in the management and control of its
property.   Each certificate, therefore, must be taken as, in a

sense, constituting a muniment of title to an interest in the property of the association, and its assignment carried with it the evidence of ownership of such interest. In addition to this, it is clear that the holders of these certificates regarded them not only as evidence of their ownership in the property of the association, but also as an evidence of the amount and extent of the appropriation of water which each holder possessed, or, at least, as evidencing the measure of the right of each holder to share in the distribution of water in times of scarcity. These certificates must be construed as evidences of the contract between the several members constituting the association, not only as to the property of the association held as tenants in common, to wit, the dam and canal, but also as to the contracts between the members of the association with regard to the distribution and division of the water which might be diverted in times of scarcity by means of such dam and ditch, and thus, in effect, as constituting what are ordinarily termed "water-right contracts"; and the sale and alienation of these, in keeping with the evident intent and purpose of the holders thereof making such transfers, and the purchasers or assignees of the same, were in effect conveyances, not only of the interest of the holders in the property of the association evidenced by the certificates, but as well the water-rights owned and possessed by the original holders thereof.

Do the findings of the court, supported, as they are, by the evidence in the cause, sustain the conclusion drawn by the court that each holder of a certificate in the Utah Irrigating Ditch Company is entitled to have and receive upon the lands used and occupied by him, through the Utah irrigating canal or its extension, during times of scarcity, an equal part,—to wit, one one hundred and twenty-eighth,—of the water flowing in said canal, without regard to the land which he may occupy? It must be conceded that in the absence of a contract between the owners of a ditch, whether that ditch be held in common or be owned by a corporation, each appropriator of water under said ditch is entitled, in times of scarcity, to be supplied in the order of his priority of appropriation. Independent of any expressed provisions of our statute on the subject, this is the settled doctrine wherever the right of prior appropriation of water is recognized and en-

forced.  Is this right one which may not be the subject of con-
tract among appropriators, or which may not be affected by
any principle of equitable estoppel?  The right of appropria-
tion is a property right, and one which may be the subject of
contract.  We are able to find nothing in our statutes which is
to be construed as in anywise affecting the right of appro-
priators of water, by means of a common ditch, to agree among
themselves as to the manner in which they may enjoy their
several appropriations.

The general doctrine that a water-right may be the subject
of contract apart from the land to which it has been applied
must be understood, in the case of sale or alienation, as being
always subject to the acquired rights of others to the use of
water from the common source.  The purchaser succeeds to
the rights of his vendor, and the measure of his right is the
appropriation made by the vendor, when no change in the
place of diversion or application in the use of water follows
from such conveyance.  When, however, the water-right pur-
chased is sought to be applied upon other lands, the purchaser
may change the use to the same extent and as fully as the
original water-right holder might do.  If such change does
not result in decreasing the amount of water available to
another water-right holder under the latter's appropriation,
then such change may be made, otherwise not.  A prior appro-
priator may change his appropriation from one tract of land
to another when he applies the water to lands he owns or pos-
sesses, and when this does not involve an injury to another
appropriator.  If A, the owner of a water-right attached to
and capable of irrigating one hundred acres of land, sells a
one-half interest in such water-right to B, the owner or pos-
sessor of fifty acres of land, the latter succeeds to the right of
A to the extent of his purchase, and in times of scarcity
obtains by such purchase the right to an equal division of the
water with A, whose appropriation is therefore by such trans-
fer cut down from one hundred acres to fifty acres.  Such
transfers are not inconsistent with economy in the use of
water, or with the highest development and improvement of
our arid lands.  It often happens that land, after many years
of cultivation, through the operation of natural laws, by ero-
sion or by floods, leaving deposits of coarse gravel and
bowlders, and in some instances by the effects of irri-

gation of soils having an excess of alkali, becomes unfit
for profitable cultivation.    To deny to a prior appro-
priator the right to change his appropriation to other
land better suited to cultivation, when this may be done
without depriving another of water to which the latter would
be entitled, would not be in the interest of the best and highest
use of water and the reclamation and profitable cultivation of
our arid lands.    In all the other arid states and territories
where the prior appropriation to the use of public waters is
recognized as a property right, the courts have uniformly
recognized the right of an appropriator to change the place of
application of water for beneficial use.    Counsel for appellants
contend that the statutes of this territory are inconsistent with
this doctrine, and refer us to paragraph 3215 of the Revised
Statutes, which reads: "During years when a scarcity of
water shall exist, the owners of fields shall have precedence
of the water for irrigation according to the dates of their
respective titles or their occupation of the lands either by
themselves or their grantors.    The oldest titles shall have pre-
cedence always."    This section of the statute was a part of
what is termed the "Howell Code."    It was taken from the
statute of New Mexico, and was a re-enactment of the old
Spanish and Mexican laws governing public "acequias," as
they were called.    In 1864, when the Howell Code was adopted,
the only sections of the territory where irrigation was prac-
ticed to any extent were along the San Pedro and Santa Cruz
rivers, and in those sections first settled by Spanish-speaking
people, where public acequias had been constructed and the
old Spanish and Mexican laws enforced.    The private ditch,
as distinct from the public acequias, appears to have been
practically unknown up to this time, except where the owners
of large tracts of land may have constructed ditches within
their own boundaries for their own use or that of their ten-
ants.    Thus, acequias constructed over the public lands, or
through the lands of several proprietors, were regarded as
public acequias, and the rights of the users of water under
them were regulated by the law which had prevailed in Sonora
prior to the acquisition of the territory from Mexico.    Para-
graph 3223 of the Revised Statutes, which also constituted a
part of the Howell Code, in recognition of this, provided that
"the regulations of acequias which have been worked accord-

ing to the laws and customs of Sonora, and the usages of the people of Arizona, shall remain as they were made and used up to this day, and the provisions of this chapter shall be enforced and observed from the day of its publication.'' At the time paragraphs 3215 and 3323 were adopted paragraph 3201 was also adopted, which recognized the right of owners and possessors of arable and irrigable lands to construct, as they might elect, public or private ditches, and appropriate for use upon such lands water from any running stream. After 1864 few, if any, public acequias were constructed, and private ditches became the rule, and to these have been applied, so far as applicable, the general rules and principles governing water-rights adopted and enforced generally in the arid states and territories where the common-law doctrine of riparian rights is not recognized. While we do not say that paragraph 3215 cannot be made to apply to private as well as public acequias, we hold that its strict application must necessarily be restricted to the latter. The paragraph declares that the oldest land titles shall have precedence always in the use of water in times of scarcity. To apply this doctrine literally to owners of land under private ditches, without regard to the time of diversion of water and application of same to the irrigation of such lands, would be a radical departure, not only from the accepted doctrine governing water-rights in other arid states and territories, but also from the rules which have been followed by the courts of this territory since its organization. As applied to private ditches, the statute must be construed as a declaration that not mere priority of diversion, but priority of use and appropriation of water upon particular lands, shall govern in determining conflicting rights; and this, as we regard it when considered in connection with paragraph 3201, is the underlying principle in its broad application to all appropriations of water for irrigation, whether by means of public or by means of private ditches. Such a construction, therefore, does not exclude the right of an appropriator to permanently change his water-right from one tract of land to another, or does not deny to a purchaser of such water-right the right to apply such water-right to land owned or possessed by him, subject to the condition that such change in place of use does not injuriously affect others who have previously acquired rights to the use of water from the common source.

If, therefore, water-right holders, under a private ditch, have a property interest in such water-rights, severable from the lands which have been irrigated under them, and these interests are assignable, so that, as between the vendors and vendees, such assignments carry with them all of the privileges of priority enjoyed by the original holders, and if in this case we construe the certificates in the Utah canal as evidencing water-rights or appropriations owned by the holders, the owners of land under the extension of the canal who have purchased such certificates have succeeded to all the rights of the original holders who are the owners of lands in the original twenty-five quarter-sections. The latter parted with so much of their water-rights as were represented by the certificates sold or assigned, and these interests became the property of the purchasers or assignees, and as all the original holders of land under the canal, by contract among themselves, stood upon an equal footing, so far as priority of right is concerned, it could make no difference to those who retained their certificates whether the others continued to irrigate the original lands possessed by them or other lands, or whether they assigned these rights to others, who used them in the irrigation of lands which they either owned or possessed, unless by such change such original holders received a less quantity of water than if no change had been made. No attempt was made to show that the change from what was known as the "Bottom Lands," which comprised the original twenty-five quarter-sections, to the "Mesa Lands," of water-rights evidenced by the assigned certificates, in itself curtailed the amount of water available to these owners of land and water-rights who retained the original holdings. The case was made under the theory that the transfer of these certificates does not carry with it the rights of the original holders to a division of water during times of scarcity upon the *pro-rata* basis, and that under the statutes of this territory a water-right which is once attached to a particular tract of land cannot be severed from such land and transferred to another and retain its priority, and therefore the ruling as to the assignability of water-rights recognized elsewhere cannot apply to this territory. We hold that our statutes, while recognizing the ownership and possession of land as essential to the acquisition and enjoyment of a water-right for purposes of irriga-

tion, and while limiting its use to the particular lands to which it is attached, do not deny the right of alienation, and the transfer of such right from one particular tract of land to another, except under the limitations that the transferee is of the class of persons entitled to make a valid appropriation by virtue of being the owner or possessor of arable and irrigable land, and that such change does not injure another having rights which have accrued at the time of such transfer and change of use.

The court found, and the evidence abundantly sustained the finding, that, beginning with 1883, certain holders of the one hundred and twenty-eight original certificates sold or assigned them to persons who located and settled upon lands under the extension of the canal, and upon what is known as the "Mesa," and that these latter holders of these certificates, up to the time of the commencement of this suit, with the acquiescence of the other holders of certificates, have enjoyed the same use of water, and the same equal division of water in times of scarcity, with those who retained their certificates and their original holdings of land. Does not this long acquiescence in this use and division of the water, and recognition of the rights of these Mesa holders of land and certificates, estop plaintiffs from, at this late date, asserting their priority of right, conceding them to possess this? In the case of *Dalton* v. *Rentaria,* 2 Ariz. 275, 15 Pac. 37, this court held that one who stands passively by and allows another to open out fields and irrigate them with water for sixteen years, under the belief that he has a vested right to an equal user thereof, is estopped from subsequently denying this right. The facts of this case show that the rights in controversy were held by the parties under a public acequia. Mr. Chief Justice Wright in this case uses the following language: "We entertain the belief, from the evidence in this case, that there was a custom among these people in the distribution of this water; that that custom was certain, definite, uniform, and notorious; that it had in it the elements of equity and a good conscience, of neighborly kindness and good will, and that under it cultivators of the 'old fields,' while claiming the prior right to the use of said water, and the cultivators of the 'new fields' were claiming an equal right to the use thereof, had settled their wrangles and disputes, and had lived together as neighbors

and friends for more than sixteen years, and had ultimately acquiesced in an equitable and equal distribution of said water, giving the first to those fields that needed it the most; and this custom, we think, has acquired sufficient age to give it the force and sanction of law." The present case is even stronger in its facts than the Dalton case, inasmuch as the court found that the holders of certificates under the extension, with the acquiescence of the others, and upon the understanding and belief that they had equal rights with the others, have expended large sums in the improvement and cultivation and betterment of their lands, the erection of buildings, and other improvements thereon, and that this has continued from eight to sixteen years. We think the doctrine of estoppel, as applied in the Dalton case, applies with equal, if not greater, force in the present case, and that this, in itself, is sufficient to support the judgment by the trial court.

Upon the complaint of the intervener, the court found as follows: "And the court further finds that, ever since the construction of said canal as aforesaid, certain Pima and Maricopa Indians who, with their descendants and successors in interest are now wards of the United States, and are under the charge and control of the intervener, Elwood Hadley, as United States Indian agent, have contributed by their labor to the enlargement and maintenance of the said canal and the dam in said Salt River, by means of which the water in said Salt River is diverted into said canal, and that in consideration of such labor and services the said Indians have received, as compensation therefor, one tenth of the water flowing in said Utah canal for distribution to the holders of shares or water-rights in the said Utah Irrigating Canal Company, and which said water has been used by said Indians in the irrigation of lands cultivated by them and irrigable from said canal." Under this finding of fact, the court entered the following judgment: "That there be apportioned and delivered to the interveners, the Pima and Maricopa Indians, by their agent duly appointed by the United States, a sufficient amount of water to irrigate their lands in sections 35 and 36, not to exceed one-tenth part of the water flowing in the Utah irrigating canal for distribution to the holders of shares or water-rights in the said Utah irrigating canal, for the use of said Indians for the irrigation of the lands occupied by them

irrigable from said canal, upon conditions that the said In-
dians perform one-tenth part of the work and labor and pay
one-tenth part of the necessary expense incurred and paid by
the said Utah Irrigating Canal Company in the maintenance
of the said Utah irrigating canal and the said dam by means
of which the water from said Salt River is diverted into said
canal.'' As found by the court, the right of the Indians to
water from the Utah canal arose, not from ownership of
shares of stock in the canal, but from the fact that they and
their predecessors in interest contributed to the building, en-
largement, and maintenance of the canal by their labor, and
that ever since the construction of the canal they had been
accorded such rights. It is shown that the Indians occupy
sections 35 and 36 of township 1 north, range 5 east, and that
these sections constitute part of the original twenty-five
quarter-sections settled upon by the original shareholders in
the Utah ditch. The rights of the Indians are thus in the
nature of rights by prescription, but whatever may be their
origin, they are now as firmly established as though they were
shareholders in the canal. The intervener objects to the judg-
ment, upon the ground that the court limited the apportion-
ment of water for the irrigation of these sections by the
Indians to an amount not exceeding one-tenth part of the
water flowing in the Utah irrigating canal for distribution to
the holders of shares or water-rights in the same, and granted
this upon the condition that the Indians perform one-tenth
part of the work and labor and pay one-tenth part of the
necessary expense incurred and paid by the company in the
maintenance of its canal. The testimony shows that, although
the Indians occupy sections 35 and 36, they have never culti-
vated during any one year in excess of one section. It was
also shown that the lateral ditch from which the Indians take
their water from the Utah canal has a carrying capacity of
not to exceed four hundred inches, one witness stating it to be
from three hundred to four hundred inches. Under the con-
tract and agreement between the Utah Irrigating Canal Com-
pany and the Alamo Irrigating Company, the former is en-
titled, during times of scarcity, to three thousand miners'
inches before the latter company has any right to the use of
water. As we have found, the practice since the construction
of the canal has been to prorate this amount among the share-

holders and landholders under the Utah canal, and hence the trial court evidently, in fixing the maximum amount of water which the Indians might take from the canal at three hundred inches, had in mind this total of three thousand inches, and the carrying capacity of the Indians' ditch, and the amount of land cultivated for any one season by them. At any rate, if the carrying capacity of the Indians' lateral be three hundred inches, and the amount of water which the Utah canal has the exclusive right to use be three thousand miners' inches, the apportionment of one-tenth of this amount to the Indians is in keeping with the evidence. The Indians certainly cannot claim, when we consider the nature and origin of their rights, more water than they have heretofore used and enjoyed, and it is not shown by the evidence that that would exceed one tenth of the amount diverted and used by the shareholders in the Utah canal. The requirement that the Indians shall perform labor in proportion to the amount of water they are permitted to use, under the decree, and pay one tenth of the expense incurred in the maintenance of the canal, is conformable to the terms and conditions hitherto imposed by the Utah Canal Company upon the Indians, and is not unreasonable, and we see, therefore, no reason why the decree of the court in this regard should be modified or changed. The judgment and decree of the court is affirmed.

Davis, J., and Doan, J., concur.