[Civil No. 1531.   Filed May 10, 1918.]

[172 Pac. 730.]

MARY M. COSTELLO, as Executrix of MARTIN COS-
TELLO, Deceased, Appellant, v. JOHN GLEESON,
Appellee.

1. MINES AND MINERALS — CREATION OF TRUST — EVIDENCE — PARTNER-
SHIP.—Evidence *held* insufficient to warrant the finding by the trial
court that defendant's testator held one-half of a mining claim in
trust for an alleged partner, or that he held other mining claims in
trust for the alleged partnership.

2. TRUSTS — CREATION OF PARTNERSHIP TRUST — EVIDENCE REQUIRED.—
Proof of a consummated partnership which would have the effect
of establishing a trust relation ought to be as clear and satisfactory
as is required to prove the trust relation direct.

3. MINES AND MINERALS—PARTNERSHIP—ESTABLISHMENT OF RELATION
—WEIGHT AND SUFFICIENCY OF EVIDENCE.—Evidence *held* insuffi-
cient to prove the establishment of the partnership relation.

[As to what constitutes a partnership, see note in 115 Am. St. Rep.
400.]

4. MINES AND MINERALS—PARTNERSHIP—DISSOLUTION AND ACCOUNTING
—EVIDENCE.—Evidence *held* to show that plaintiff had received from
defendant's testator a return of the money he claimed he had paid
into the partnership, and had thereby dissolved the partnership, and
abandoned any interest therein, if one existed, and that the alleged
partnership property was the individual property of defendant's tes-
tator.

APPEAL from a judgment of the Superior Court of the
county of Cochise.   Alfred C. Lockwood, Judge.   Reversed
and remanded.

Mr. Joseph Scott, Mr. Ben Goodrich, and Messrs. Ellinwood
& Ross, for Appellant.

Mr. Eugene S. Ives and Mr. Fred Sutter, for Appellee.

McALISTER, J.—This case is before the court a second
time upon practically the same pleadings, evidence, and
judgment.   In the former opinion it was described as:
"An equitable action prosecuted by John Gleeson, appellee,
against Mary M. Costello, as executrix of the last will and

testament of Martin Costello, deceased, appellant, praying for the dissolution of an alleged partnership, for an accounting, and for an order directing a conveyance to John Gleeson by the said executrix of an undivided one-third interest in the mining claims described in the second amended complaint and alleged to belong to the partnership." 15 Ariz. 280, 138 Pac. 544.

The judgment, now as then, decrees the existence of a partnership, and adjudges plaintiff, Gleeson, the owner of a one-third interest in the mining claims which are held to be the property of such partnership. From this judgment, together with the order denying defendant's motion for a new trial, an appeal to this court has been prosecuted. The case was tried by the court without a jury, and findings of fact full and complete, together with conclusions of law, were filed. Thirty-two errors, based largely on the findings, have been assigned, but we discuss only those deemed vital and necessary to a correct determination of the issues involved. Inasmuch as the pleadings are practically the same as in the former action, there is no necessity for restating here the respective claims of the parties as they appear in the third amended complaint and the second amended answer upon which the case was tried and is here for review. The executor of Reilly's estate was made a party defendant in this action, but his answer contains only an admission of Reilly's death, and the appointment and qualification of his executor, together with an allegation denying any knowledge or information on the part of the executor relative to the facts alleged in the third amended complaint and submitting any interest or claim which Reilly's estate might have in the partnership to the consideration of the court.

It appears from the findings that in December, 1901, John Gleeson, appellee, one James Reilly, and Martin Costello, decedent of appellant herein, agreed to form a partnership, having for its object the owning, working, and selling of four certain contiguous mining claims, situated in the Turquoise mining district, Cochise county, Arizona, to wit, the San Francisco, Fennard, Batavia, and Mono. By the terms of this agreement it was provided that Gleeson should contribute to the partnership an option which he then held, and on which he had paid $350 in monthly payments of $50 each, to purchase from one Patrick Power, for $20,000, within 18

months from May, 1901, three of the aforesaid mining claims, to-wit, the San Francisco, Fennard, and Batavia, which were valued at $40,000; that Reilly and Costello should contribute the Mono mining claim, which was valued at $20,000, and of which they were then the owners, but, in order that the contributions of the three partners might be equal, it was agreed that Costello and Reilly should pay the $20,000 purchase price called for by Gleeson's option from Patrick Power, less the monthly payments already made by Gleeson.

Two months thereafter, to wit, in February, 1902, at a conference of the three partners, on the suggestion of Reilly, it was decided to extend the scope of the partnership so as to embrace a large number of other mining claims in the Turquoise district, in which, in the opinion of Gleeson, Reilly, and Costello, the mining industry was then looking up. At that time Costello was the owner of over $200,000 in cash, but was indebted to Reilly in the sum of $90,000, and John Gleeson, on that day, became the owner of four promissory notes, aggregating $53,000, secured by a mortgage on certain mines and mining claims of the Copper Belle Mining Company. Gleeson objected at first to Reilly's proposal to extend the scope of the partnership by the purchase of other claims upon the ground that he had not the means to enter upon such an undertaking, whereupon Costello agreed to advance the money for him, provided he would transfer to Costello the said Copper Belle notes as security for Gleeson's contributions, and provided, further, that title to all the claims acquired should be taken in the name of Costello, and so held until Gleeson and Reilly should contribute their share of the purchase price of said claims. In pursuance of this arrangement, Gleeson at that time left said notes with Reilly, representing the partnership, "as security for his obligation to contribute his share of the expenses of the partnership."

It was further agreed that Gleeson, being a man of experience in the mining industry, should contribute his knowledge and experience in acquiring such claims as they might desire; that Reilly, who was an attorney at law, should contribute the legal services necessary in the acquisition and disposition of said claims; and that Costello, a man of large means, should advance, without interest, the cash necessary to purchase said claims, subject to reimbursement by Reilly and Gleeson in proportion to their one-third interests. In pursuance of the

agreement to extend its scope, the partnership purchased, between 1902 and 1908, a large number of mining claims in the Turquoise district, and took title to same in the name of Costello, who advanced from his personal funds all the money therefor, to wit, about $80,000.

Shortly after the partnership decided to increase its holdings, the Power option, because of the decrease in value of mining property and the depressed condition of the mining industry generally in the Turquoise district, was by mutual agreement abandoned, and payments stopped thereon, under the belief that a second option could be procured later on at a less price; and thereafter, to-wit, on June 6, 1903, an option on the said San Francisco, Fennard, and Batavia mining claims was taken from Patrick Power by the partnership in the name of Costello, which option was thereafter consummated by Costello's paying the purchase price of the said claims.

In August, 1903, Gleeson, Reilly, and Costello formed a corporation, the Costello Copper Company, for the more convenient handling of the mining claims owned by the partnership. It was agreed shortly before this that when the partners were ready to begin active work on the mines, and Gleeson and Reilly had contributed their proportions of the purchase price of the said claims, Costello should deed to the corporation all the mines owned by the partnership, and that John Gleeson should have the management of the affairs of said corporation, at a salary of $250 per month, and be paid $60 per month for the use of his teams and wagons. The Costello Copper Company, however, transacted no business whatever, and none of the claims was deeded to it, but Martin Costello paid for all assessment work, taxes, and the expenses of making locations and procuring patents.

Litigation arose over the Copper Belle notes not many months after their receipt by Gleeson, who, acting upon the advice of Reilly, transferred them to Martin Costello for the purpose of making more sure their collection, in consideration of the sum of $25,000 and other mining property situated near Tombstone. This transfer, while ostensibly evidencing a sale in fact, was, in reality, a wash sale, not *bona fide*, and made solely for the purpose of enabling Costello to collect the notes; it having been mutually agreed between Costello and Gleeson that when they were collected Costello

should turn the proceeds over to Gleeson, the real owner of the notes.

In September, 1907, Costello granted to L. W. Powell, representing the Calumet & Arizona Mining Company, an option to purchase certain of the partnership mining claims for the sum of $150,000, to be paid as follows: $15,000 down, $35,000 on or before September 30, 1908, and $100,000 on or before March 30, 1909. Gleeson had promised Powell, shortly before this, while Costello was in Europe, an option covering this identical property, and on the same terms, except that he required no payment down, whereas Costello demanded a ten per cent initial payment and refused to sign any option which did not contain such provision, whereupon Gleeson, desirous that the sale be consummated, guaranteed said L. W. Powell, representing the Calumet & Arizona Mining Company, a repayment of the ten per cent demanded by Costello in case said option was not completed, and, since no payments other than the initial one of $15,000 were made thereon, the option was surrendered and Gleeson forced to return to said company $6,250, but the agreement to return this initial payment was the individual obligation of Gleeson; the other parties having neither consented to it nor ratified it. Gleeson was very active in the negotiations of the said option for the reason that he and one Douglas Gray were interested in an option on which L. W. Powell, representing the Calumet & Arizona Mining Company, had paid them $15,000, and he believed that if the option on the partnership property was taken by the Calumet & Arizona Mining Company also, it would make the consummation of the option he and Gray were interested in more probable, since the properties covered by the respective options were located in the same district not very far apart. The Calumet & Arizona Mining Company, however, abandoned its option by failing to make the second payment of $35,000 due September 30, 1908, but thereafter, to-wit, on December 16, 1908, the Copper Queen Consolidated Mining Company took an option on the same property, upon which Costello received about that date the sum of $35,000, and on June 21, 1909, a further sum of $57,500. Thereafter said Copper Queen Consolidated Mining Company abandoned said option, making no further payments thereon.

By August, 1908, the suit on the Copper Belle notes had been decided, and the proceeds were ready to be paid over

to Gleeson. Reilly wrote Gleeson on August 8, 1908, to this effect, inclosing a statement of the amount due Reilly by Gleeson on account of various legal services, and on September 13, 1908, "Gleeson called upon Reilly and Costello in Tombstone for the purpose of settling up the Copper Belle transaction, and all of his dealings with Reilly and Costello, and repaying the said Costello, such sums as were due him for money advanced on behalf of Gleeson's interest in the partnership." At the interview which the three partners then had, Reilly, who had been for years the legal adviser of both Gleeson and Costello individually, and who had acted also as legal adviser for the partnership, and kept a record of its transactions, produced a list of the partnership mining claims, with the amounts paid for each, from which the Casey claims, to-wit, the Tin Horn, Hard Up, and Head Center, were omitted, and to this Gleeson objected. Costello then, for the first time, denied that either Gleeson or the partnership owned any interest in these three claims, but admitted the existence of the partnership and Gleeson's interest as to the other claims. After a heated controversy between Costello and Gleeson as to whether these three claims belonged to Costello or the partnership, Reilly suggested that, inasmuch as the money due in a few days under the option to L. W. Powell, representing the Calumet & Arizona Mining Company, was more than sufficient to pay all moneys advanced by Costello, it was not necessary that Gleeson repay Costello for his advances out of the proceeds of the Copper Belle notes, but that he should take the money and have no further dispute over the matter, and everything would be all right. Realizing that the title to the mining claim stood in Costello's name, and that the notes had been transferred to him also, and fearing that if he did not accept the proceeds of the notes as suggested by Reilly he would lose both his money and his interest in the property, he accepted from Costello, without deducting anything for his contribution to the partnership, the money due him on the Copper Belle notes, less the amounts due both Costello and Reilly on account of individual transactions, and an item of $11,549.19 due Mrs. Reilly. Gleeson thereafter executed a deed in favor of Martin Costello conveying the mines deeded by the latter to the former as a part of the consideration for the pretended sale of the notes, and offered to deliver the same to Costello, but he refused

it, as did his executrix when the offer was renewed after his death.

The interest of James Reilly in and to the assets of said copartnership were transferred by him to Costello before the former's death, which occurred June 8, 1909. This action was filed September 24, 1909, and Costello died September 15, 1911.

The foregoing gives the substance of the court's findings and with sufficient particularity for the purposes of this decision.

The assignments of error in the main revolve around the question of the sufficiency of the evidence to support: First, the finding that Gleeson, Costello, and Reilly entered into a partnership agreement in December, 1901, relating to the four mining claims, San Francisco, Fennard, Batavia, and Mono; and, second, the finding that the scope of such partnership was extended in February, 1902, when the three partners agreed to purchase a large number of other claims in the Turquoise mining district; and, third, the further finding that Gleeson did not relinquish and abandon any interest he may have had in the partnership by the transaction or settlement of September, 1908. Appellant contends, first, that the evidence is not sufficient to support the finding that a partnership agreement relating to the three Power claims and the Mono was made and consummated, for the reason that there is nothing in the record to show that Reilly ever owned one-half of the Mono claim or contributed such one-half or any other thing of value to the alleged partnership. According to Gleeson's allegations, and the court's findings, the assets of the partnership, to begin with, consisted of four mining claims, to-wit, the San Francisco, Fennard, Batavia, and Mono, valued, for partnership purposes, at $60,000, which were contributed by Gleeson, Reilly, and Costello in equal proportions. Gleeson's contribution of $20,000 was the Power option, of which he was then the owner, and upon which he had paid $350 in monthly installments of $50 each. Reilly's and Costello's contributions were one-half each of the remaining purchase price of the San Francisco, Fennard, and Batavia claims, which was $20,000, less the payments made by Gleeson, and one-half each of the Mono claim, valued at $20,000, of which they were then the owners. The option contributed by Gleeson gave him the right to purchase from

Patrick Power, within 18 months from May, 1901, for $20,000, three of the above-mentioned claims, to-wit, the San Francisco, Fennard, and Batavia. This option, however, was permitted to lapse on July 1, 1902, but a new one, giving the right to purchase the same three claims for $20,000, was procured on June 6, 1903, in the name of Martin Costello, which option was exercised November 6, 1904, when a deed conveying these three claims to Martin Costello was executed by Patrick Power. It is admitted by both parties that the purchase price of $20,000 for the three claims under the second Power option was paid by Costello, though there is a disagreement as to whether he was credited on this option with the installments paid by Gleeson on the first one. Whether one-half of this amount, however, was for the benefit of Reilly, does not appear. The record title to the Mono claim, as shown by stipulation of the parties, was in the name of Martin Costello in December, 1901, and if Reilly was the owner and contributor of a one-half interest in this claim, such facts can only be deduced from the conversation had between Gleeson, Costello, and Reilly at the latter's office in Tombstone, in December, 1901, when, and as a result of which, it is alleged and found, the partnership agreement was entered into.

Gleeson's version of the conversation is as follows:

"There was a conversation between Reilly, Costello, and myself in regard to the mining claims. Goodbody, O'Brien, Reilly, Costello, and myself were present. Judge Reilly says to Costello, 'Well, John has got this option on the Power claim for $20,000, and we got the Mono, and I told him that we would pay the option, and we would put the Mono and Power claims into the partnership,' something to that effect; Judge Reilly made that suggestion. He made it long before this, that I would put the Power option and they would put in the Mono claim. He said him and Martin Costello owned the Mono claim. Martin Costello said, 'Yes, all right; that will be all right.' I can't tell you all of the conversation; it was so long ago."

In the former trial of this case Gleeson testified:

"Judge Reilly never contributed a cent that I know of."

Frank O'Brien, a former probate judge of Cochise county, who had come to Tombstone from the mine with Gleeson, and who was at the time manager of the Copper Belle store and

working under Gleeson, the then superintendent of the Copper Belle Mining Company, testified that in the conversation Reilly said to Costello:

"John has got this bond on the Power property, and *you* have got the Mono claim; he wants to throw it in together. He wants *you* to throw in the Mono with the Power group and make one claim of the whole property. Bond and all. He will throw in his share, his bond. And Reilly said to Gleeson, 'How about that, John—is that all right?' Gleeson said, 'Yes,' and then he turned to Martin and says, 'How about it, Jew; how about it?' and Martin says, 'Yes, all right; that will be all right.' That is about all the conversation I remember in respect to the Power and Mono claims."

Frank Goodbody, an attorney working in the office of Judge Reilly at the time, does not state whether Reilly used the word "we" or "you" when referring to the owner of the Mono claim, but testified:

"The Mono claim had been owned by Joe Muheim, in Bisbee, and there was a tax title from Mr. Neale, and Mr. Leavenworth and myself assisted Judge Reilly in straightening out that title and giving it to Costello. That was done in Costello's name."

Costello purchased the Mono in 1901, a short time before the alleged agreement, at a tax sale, paying for it only a nominal consideration, and at the trial of this case before Judge Campbell, in 1910, he testified:

"Judge Reilly had no interest in the Mono whatever, and was never interested in any mining claim with me."

Judge Reilly's letter of April 25, 1901, to J. Henry Work, an attorney, of New York, inquiring about the purchase of the Mono by Costello, shows very clearly that the latter's statement regarding the Mono claim was true at that time.

Lee O. Woolery, an attorney employed in Judge Reilly's office at various times between 1899 and 1908, and who returned from Indiana in June of the latter year at the request of Judge Reilly, testified as follows:

"A few weeks before Judge Reilly left Tombstone the last time [late in 1908], going to California, he told me in his office on Fourth street that he brought me out here for the reason that Costello owned a number of mining claims in the Turquoise mining district, and he was acting as attorney for Costello, and that John Gleeson had a mortgage on the Copper

Belle mines, and expected to get the mines through a fore-closure proceeding, but they did not get it, and it was their intention if they got those claims to organize a company and deed those claims, or the claims owned by Costello and Glee-son, to the Costello Copper Company, or a corporation owned by them, and they wanted me to act as secretary of the com-pany; that is the reason he wanted me back out here."

Any knowledge of his decedent's interest in the alleged partnership is disclaimed in the answer of the executor of Reilly's estate, a party defendant, notwithstanding there is nothing in the record of the former trial, nor in this one, to show that if Reilly ever owned and contributed, either directly or indirectly, a one-half interest in the Mono and one-half of the purchase price of the Power claims, as testified to by appellee, such interest, valued then for partnership purposes at $20,000, is not now a part of the assets of his estate, for no transfer thereof to Costello was shown, or attempted to be shown, in substantiation of appellee's allega-tion that such had been done.

The record contains no evidence, other than Gleeson's state-ment, which even tends to prove that Costello paid one-half of the $20,000 for the San Francisco, Fennard, and Batavia claims, for the benefit of Reilly, or that Reilly was the equi-table owner of a one-half interest in the Mono claim, or that he contributed such interest to the partnership. And we think that such facts are not established by appellee's testi-mony that Reilly, in a conversation held ten years before, used the first personal pronoun "we," meaning Costello and Reilly, instead of the second personal pronoun "you," mean-ing Costello alone, in the expression "we got the Mono" and "we would pay the options," and "we would put the Mono and Power claims into the partnership," to which Costello replied, "Yes, all right; that will be all right." Especially is this true in view of appellee's former statement that "Judge Reilly never contributed a cent that I know of," and Cos-tello's testimony that "Judge Reilly had no interest in the Mono whatever, and was never interested in any mining claims with me." Costello's reply, "Yes, all right; that will be all right," even though it be held to be an admission against interest, and given the fullest weight possible, would not be sufficient in an action prosecuted by Reilly's executor to deprive Costello's estate of its legal title to any part of the

mining claims which Costello purchased with his own funds. In the light of the case of *Costello* v. *Cunningham*, 16 Ariz. 447, 147 Pac. 701, such a declaration, standing alone or taken in connection with the other evidence in this record, would not warrant the court in finding that Costello held one-half of the Mono mining claim in trust for Reilly in December, 1901, nor that he held it, together with the San Francisco, Fennard, and Batavia mining claims, in trust for the partnership, after that date. As said by this court in the Costello-Cunningham case:

"These statements by Costello became admissible as evidence only because they were made by him against his interest. Clearly such statements, when given the most favorable effect to the plaintiffs, are simply statements to the effect that Cunningham owned a half interest with Costello in mines in the Warren mining district, and that Cunningham was a partner with Costello in mines situate in that mining district. Such statements and declarations, standing alone, are not sufficient evidence to determine, or sufficient evidence of its nature to warrant the court in finding that Costello and Cunningham acquired mines by each paying an equal share of the expenditures laid out in their acquisition, and that Costello took the record title thereto . . . in his name in trust for the use and benefit of himself and his co-owner, Patrick Cunningham. Such statements and declarations made by Costello are insufficient, standing alone, to establish the trust contended for. *Leatherwood* v. *Richardson*, 11 Ariz. 278, 94 Pac. 1110. . . . The rule requiring the evidence to be clear and satisfactory is especially applicable where the trust is attempted to be proved by parol evidence, as well as when it is sought to convert into a trustee a person holding the title to property ostensibly as absolute owner. 39 Cyc. 84, 85. The statements and declarations of a holder of the record title of mines, made against such title, can affect the holder's title only by way of working an estoppel. Oral statements or silence could never have the effect to pass title which the statute expressly declares shall be transferred by deed only. *Hayes* v. *Livingston*, 34 Mich. 384, 22 Am. Rep. 533; *Nims* v. *Sherman*, 43 Mich. 45, 4 N. W. 434. 2049 Revised Statutes of Arizona 1913."

A consummated partnership which would have the effect of establishing in Costello the trust relation regarding these

claims ought to be proven by evidence as clear and satisfactory as would be required to show the trust relation direct, without the intervention of a partnership. If, therefore, the evidence be considered sufficient to substantiate the finding that the partnership agreement was entered into in December, 1901, as alleged, before a consummation thereof can be made to appear, it must be shown that each of the partners contributed his proportion of the agreed assets. The fact that Gleeson and Costello may have paid their proportions would not establish a partnership composed of Gleeson, Reilly, and Costello, with each contributing property valued at $20,000, when there is no showing that Reilly, either directly or through Costello, paid his. ''The mere agreement to form a partnership does not, in itself, create a partnership; nor does the advancement by any one party of his agreed share of the capital. The entire agreement and all of the attending circumstances are to be taken into consideration in determining whether a partnership was actually launched.'' 30 Cyc. 357.

The court has found, as alleged by appellee, that a supplemental partnership, extending the scope of the original one so as to embrace a large number of other claims in the Turquoise district, was entered into by the three partners in February, 1902. This is an important finding, which has been assigned as error and fully argued by both appellant and appellee in their very exhaustive briefs, but we deem a discussion of it unnecessary, in view of the transaction of September, 1908, as it is termed in the record, and the construction which must be placed thereon. Appellant contends that even though the supplemental agreement was entered into and the claims described in the third amended complaint purchased by the partnership in pursuance thereof, a proper construction of the transaction or settlement of September, 1908, will establish the fact that appellee by that act withdrew any contribution he may have made to the partnership in its extended scope, and that the effect of such withdrawal was to dissolve any partnership theretofore existing, thus ending Gleeson's connection with the partnership and leaving Costello the owner of the equitable as well as the legal title of all claims alleged to have been purchased by the partnership. The basis for this position is found in paragraph 16 of appellee's second amended answer, which reads as follows:

"Further answering said third amended complaint, this defendant is informed and believes and therefore alleges that if any partnership or trust relation ever existed between plaintiff and Martin Costello, deceased, in relation to any of the properties described in said complaint, whether as alleged therein or otherwise, which this defendant does not admit, but, on information and belief, denies, such partnership, or trust, was fully dissolved and terminated during or about the month of September, 1908, at which time a full and complete accounting and settlement of the affairs of said alleged partnership was had and completed between plaintiff herein and Martin Costello; that at said time plaintiff herein voluntarily withdrew all and any contributions theretofore made by him to or for the benefit of said alleged partnership and received full payment thereof from Martin Costello; that in and by said accounting, settlement, and payment, plaintiff herein renounced and relinquished all and every alleged interest or claim of interest in or to any of the properties mentioned in the third amended complaint, and that his alleged interests therein, or in said alleged partnership thereupon ceased and determined; that plaintiff thereupon voluntarily relinquished all of said properties to the said Costello, who at all times thereafter, at his own expense and risk and without any cost or hazard to plaintiff herein, continued to control and care for said properties in the purchase of which he had expended approximately $100,000 of his personal funds; that having thus freed himself of all risk or hazard of said alleged partnership enterprise, and having withdrawn all of his alleged contributions thereto, and having so continued without risk or hazard of loss, plaintiff now seeks to participate in the fruits of Costello's successful handling of said properties, all of which was attained at the sole risk and by the sole efforts of Costello, and at his sole expense; that when plaintiff so withdrew his alleged contributions to said alleged partnership, said alleged partnership, if any there was, was largely indebted to Costello for moneys expended by him in the purchase of said properties and in perfecting and maintaining the titles thereto, no part of which was then or at any time paid by plaintiff."

In order that the transaction or settlement of 1908 and its relation to this suit may appear, a brief statement of the facts of the case of *Martin Costello* v. *Copper Belle Mining*

*Company, a Corporation,* is necessary. In February, 1904, Martin Costello filed suit in the territorial district court at Tombstone against the Copper Belle Mining Company, a corporation, on four certain promissory notes aggregating $53,000 and executed under date of February 4, 1902, by the said Copper Belle Mining Company in favor of John Gleeson, each in the principal sum of $13,250, and bearing interest at the rate of three per cent per annum, interest payable annually. These notes matured one each year for the years 1906, 1907, 1908, and 1909, respectively, and their payment was secured by a mortgage on ten mining claims of the said Copper Belle Mining Company located in the Turquoise mining district. It was further alleged that in July, 1902, and before any of said notes became due, John Gleeson, for a valuable consideration, assigned and delivered them to Martin Costello, who then became and thereafter remained the owner and holder of said notes, together with the mortgage securing their payment. The Copper Belle Mining Company answered by denying, among other things, that Costello was the owner and holder of said notes and mortgage, or that he was the real party in interest, or that Gleeson ever indorsed or delivered said notes to Costello, and alleged a lack of consideration for the notes. Gleeson, who was made a party defendant on motion of the Copper Belle Mining Company, admitted in his answer the making of a certain agreement which the said company had pleaded also as a defense, and which would probably have been good against him as plaintiff in the case, but denied that Costello had any knowledge of said agreement when the sale was made and the notes delivered. So, whether the sale of these notes by Gleeson to Costello was *bona fide* or merely simulated—done for the purpose of enabling Costello, as a *bona fide* purchaser for value without notice, to do for Gleeson what he probably could not do for himself—was the pivotal point in the case. Gleeson testified that Costello paid him $25,000 in cash, and conveyed to him certain mining claims near Tombstone as consideration for the notes. Costello's testimony was to the same effect. And the trial court finally decided that Costello was a *bona fide* purchaser of the notes, and on July 29, 1908, gave him judgment for the amount due on them, to-wit, $63,659.32, and ordered foreclosure of the mortgage. This judgment was satisfied of record by Costello on August 28, 1908.

In addition to the foregoing facts concerning the Copper Belle suit, it was further established in this case that on August 8, 1908, following the rendition of the Copper Belle judgment, Reilly, who was then and had been for many years the legal adviser of both Costello and Gleeson in their individual capacities, wrote the latter informing him of the result of the case, and inclosed a statement of his account with Costello and Gleeson for legal services in reference to mortgages and suits concerning the Copper Belle mining claims. On September 13th, thereafter, Gleeson called upon Costello and Reilly at the latter's office in Tombstone for the purpose of settling up the Copper Belle transaction, and in consequence of the settlement reached at this time Costello accounted to Gleeson for the full amount of the Copper Belle judgment, to-wit, $63,659.32, by giving Gleeson a check for $33,659.32, and paying, at the request of the latter, $11,257.70 to Judge James Reilly, $11,549.19 to Mrs. James Reilly, and retaining for himself $7,423.16 in repayment of a loan he had previously made Gleeson. In the statement inclosed in Reilly's letter to Gleeson there is an item of $10,000 for legal services in the Copper Belle and other litigation, which amount was included in the $11,257.70 paid Judge Reilly by Costello at Gleeson's request. It was further shown that within 14 days from the time Costello paid Gleeson by checks the $25,000 cash consideration for the notes, which was on January 12, 1903, this entire amount was returned to him by Gleeson through Reilly acting as the agent of both parties. And the trial court, notwithstanding the contrary result reached years before in the Costello-Copper Belle Mining Company case, acting principally upon the foregoing facts, came to the conclusion, and we think very properly so, that the sale of the notes to Costello by Gleeson was not *bona fide*, but only simulated—done for the specific purpose of enabling Costello to do for Gleeson what he probably could not do for himself, viz., collect the notes. And Costello's act in returning to Gleeson the proceeds of the notes is found by the court to have been in accordance with the understanding had between them at the time the simulated sale was agreed upon that immediately after the collection of the notes by Costello he would turn over to Gleeson, their rightful owner, the entire proceeds thereof.

Although the notes were actually transferred to Costello on July 2, 1902, "for the purpose of making more sure their collection," and though the proceeds thereof after collection were turned over to Gleeson in September, 1908, yet, during all this time and for six months prior thereto, as appears from the findings, they were performing an important, though separate and distinct, function, in connection with the partnership. This is shown by the fact that in February, 1902, when the three partners decided to extend the scope of the partnership, Gleeson was without means to embark upon such an enterprise, and Costello, upon the suggestion of Reilly, agreed to advance for him his one-third of the cost thereof, but upon two conditions, viz.: First, that Gleeson would transfer to him, as security for such advances, the Copper Belle notes which had that day come into Gleeson's possession as owner; and second, that title to all claims acquired should be taken in his name and so held until Gleeson and Reilly should repay him their share of the purchase price of said claims. In accordance with this agreement, as found by the court, Gleeson at that time "left the Copper Belle notes in the possession of Reilly, representing the partnership, as security for his obligation to contribute his share of the expenses of the partnership," and in pursuance of this arrangement, during the succeeding six years, the partnership purchased a large number of mining claims, and took title to them in the name of Costello, who advanced from his personal funds in purchase price, assessment work, taxes, and the procuring of patents to a number of the claims, nearly $100,000, which was in addition to the $20,000 he had paid for the Power claims. When, therefore, Gleeson called on Costello and Reilly in September, 1908, for the purpose of settling up the Copper Belle transaction, and, as found by the court, "for repaying Costello such sums as were due him for money advanced on behalf of Gleeson's interest in the partnership," the amount due Costello because of such advances was one-third of approximately $100,000, or more than $30,000. And notwithstanding it was Gleeson's intention at that time to repay Costello out of the proceeds of these notes, and although there was no other source from which he could procure funds for this purpose, the fact remains that he accepted the full amount of the judgment, and used no part of it to reimburse Costello, and, because of such acceptance and failure to repay,

the latter was left without even security for the very advances he had agreed to make only upon a promise of security, and which in fact were only made after such security had been "left in the possession of Reilly, representing the partnership."

Such action on the part of Gleeson, appellant contends, in reality constituted a withdrawal from the alleged partnership of any contributions he had made thereto, and should be construed as having effected a termination of any partnership agreement theretofore existing, as well as a relinquishment to Costello of any interest or claim Gleeson may have had in the properties belonging to the partnership before its dissolution. The terms of the agreement extending the scope of the partnership made it the duty of Gleeson to transfer the notes to Costello as security, but instead of transferring them to him individually, as the agreement required, he "left them in the possession of Reilly, representing the partnership, as security for his obligation to contribute his share of the expenses of the partnership." And this deposit with the partnership, Reilly being merely its representative for this purpose, appears to have been accepted by Costello as a sufficient compliance with the agreement to transfer to him. It is true, however, that for the purpose of making a pretended sale appear as an actual one, and thus render more probable the collection of the notes, Gleeson transferred them to Costello in July, 1902, but such transfer was in no way connected with, nor in furtherance of, the service the notes were then performing of securing Costello, and since the sale of the notes was a mere pretense and a sham, the transfer of them in aid of such an act should be regarded likewise. If, therefore, the finding that the notes in the possession of the partnership were serving as a guarantee be accepted as true, it follows necessarily that while thus engaged they were beyond Gleeson's control and so closely connected with the contribution they were then, and for years had been, responsible for that an acceptance at that time of their proceeds by him was in reality a withdrawal from the partnership, which resulted in its termination and in the relinquishment of his interest in the property which it had owned to Costello, unless at the time there was an agreement, as Gleeson testified there was, by which he was permitted to "take down" the money and retain his interest as well by paying for it in another way.

The agreement referred to by Gleeson appears in the following examination of him by the court:

"Q. How was Mr. Costello to be repaid for the money he had advanced? A. He had those Copper Belle notes of mine. Q. Then how were you to pay him for what he had put up on this property, if you get all your money back for the Copper Belle notes? A. I had to take it back. He could have said he didn't owe me anything; that there was nothing coming. Q. How was that? A. I had to take that. He could have said there was no money. There was enough money coming from the C. & A. to pay my interest outside of that. Q. He agreed to get this money from the C. & A.? A. Yes, sir; that is the reason I took it down. Q. Now, in regard to your interest in the corporation that you were to have, were you to pay for that interest in the corporation? A. Sure, the money was up all the time. Q. That is to say, that Costello agreed that you could take down your money, and he would take a chance on the C. & A. making this payment? A. I don't see that he took any chances. Q. Well, he certainly did, since it was never paid. A. I said that I took it down— Q. You what? A. I said I took it down. Judge Reilly said, 'Call this Copper Belle transaction off. There is money enough coming from the C. & A. to pay it all. We will all get money.' I said, 'I don't want to call it off'; and Costello said, 'I never considered you an owner in the two claims and a half of the Casey,' that is why I took it down. I had nothing to show I had claims, I had money, or anything else."

It does not appear just how Reilly's suggestion that the Copper Belle transaction be called off could have furnished a reason for Gleeson's "taking down the money," since it has been established that there was no sale of the Copper Belle notes to "be called off," and that Gleeson returned to Costello within 14 days after its receipt the $25,000 "pretended" consideration for the notes. Such transaction could have been "called off" only if the testimony given by Gleeson at the first trial of this case had been true, namely, "I put up $25,000 to pay for my part of the mines, but when they called the transfer of the Copper Belle notes off, why, of course, I got that money back." While the second part of Reilly's suggestion, "there is enough money coming from the C. & A. to pay it all," seems to have been offered as an excuse for call-

ing off the Copper Belle transaction—an impossible thing under the circumstances—yet Gleeson gives it, supplemented by the statement that Costello agreed to it, as one of his reasons for "taking down the money." When Reilly and Gleeson referred to the "money coming from the C. & A.," they meant the $35,000 due September 30, 1908, and the $100,000 due March 30, 1909, on the option held by the Calumet & Arizona Mining Company on the Casey claims, to-wit, the Tin Horn, Hard Up, and Head Center—three of the most valuable claims owned by the partnership—and two others known as the Black Hawk and the Smile of Fortune. The $35,000 was not paid, however, and the option lapsed on September 30, 1908.

Gleeson's other reason for taking down the money is found in the remark he attributes to Costello, "I never considered you an owner in the two claims and a half of the Casey," which, according to Gleeson, caused him to fear that, unless he did take the money, he might lose both his interest in the claims and the proceeds of the notes, inasmuch as he had nothing to show that he owned either. Testifying further on this point, Gleeson stated that when they were trying to settle the Copper Belle matter in September, 1908, Costello denied several times that either Gleeson or the partnership owned any interest in the Casey claims, giving as his reason the fact that he had a mortgage on them before he and Gleeson went in together. After the last denial and some argument following it, they both became angry, whereupon Gleeson said, "Give me that money," to which Costello replied, "Don't get mad about it; you are all right; you can have your interest in the other claims." Gleeson replied, "By God, I will have it all or nothing; give me that money." Then it was that Gleeson accepted the money, to-wit, $33,659.32, the balance coming to him after others had been paid at his request the amounts due them.

The court finds that Gleeson, in taking the money, acted upon Reilly's suggestion—really accepted his proposition—that since there was enough money due in a few days under the C. & A. option to more than pay all moneys advanced by Costello, "it was not necessary that the said John Gleeson repay Costello for his advances out of the proceeds of the Copper Belle notes, and that it was best for Gleeson to take all of the proceeds of such notes, and have no further dis-

pute over the matter, and that everything would be all right."
According to Gleeson's reply, "Yes, sir; that is the reason
I took it down," to the court's question, "He agreed to get
his money from the C. & A.?" this arrangement was satis-
factory to Costello, but evidently the court was not convinced
on this point, for there is no finding that Costello did agree
to it. And in view of the other reason given by Gleeson, that
he "took down the money" because Costello denied his inter-
est in the Casey claims on which the "money coming from
the C. & A." would be due in a few days, it is not apparent
how such a finding could have been made. Gleeson did not
testify that Costello indicated his consent by any spoken word,
but declared that he "was right there" when Reilly made his
suggestion. Costello's continued denial, however, of Glee-
son's interest in the Casey claims in the presence of both
Gleeson and Reilly rendered it unnecessary for him to object
in specific terms to Reilly's suggestion in order that his silence
might not imply an agreement by him to take the risk of
getting his money from the C. & A. In fact, it is clear that
Costello would not have agreed to repay himself out of the
purchase price of mines he was at that very moment claiming
to be his own individual property, for advances he had made
in Gleeson's behalf. For him to have done so under the
circumstances would have been the equivalent of promising
to make Gleeson a present of a one-third interest in the part-
nership.

It may be, as the findings state, that Gleeson at the time
he accepted the money did not intend to abandon his interest
in the mining claims belonging to the partnership. Never-
theless his act in accepting the proceeds of the notes, which
all these years had been the foundation stone upon which his
interest in the extended partnership rested, without making
any arrangement whatever for paying his proportion or fur-
nishing other security therefor, shows conclusively the aban-
donment by him of his interest in the partnership property,
regardless of his intention. His statement, as Costello handed
him the check, that he would fight for this property as long
as he lived, in view of his act, is unavailing, for "actions
speak louder than words." That title to the claims stood in
the name of Costello, as agreed in the beginning, that the
Copper Belle notes had been transferred to him in further-
ance of a sham sale, together with the fact that he denied

Gleeson's interest in the Casey claims while admitting it in all the others, might have justified Gleeson in withdrawing his security in its converted form as a matter of business precaution, upon the theory of the old saying that "a bird in the hand is worth two in the bush"; but we are acquainted with no principle of law or justice which would permit him to withdraw his entire contribution because of the fear of losing both his interest and his money and afterward recover in an equitable action the very interest which the money withdrawn was supposed to pay for. He cannot eat his cake and have it too. This principle is so plain that the citation of authorities is unnecessary.

We conclude, therefore, that if a partnership did exist, as alleged, it was terminated in September, 1908, by Gleeson's acceptance of the proceeds of the Copper Belle notes, which really amounted to a withdrawal of his interest, since no arrangement whatever was then made by him either to pay his contribution or further guarantee it. By such action, Gleeson necessarily relinquished any interest he may have owned in the partnership mining claims to Costello, who, having paid from his own personal funds the entire expense thereof, approximately $115,000, thereby became the owner of the equitable as well as the legal title to said mining claims.

The judgment is reversed and the case remanded; with direction to the superior court to enter judgment in favor of appellant, declaring her, as the executrix of the last will and testament of Martin Costello, deceased, to be the owner of the mines and mining claims described in the third amended complaint, together with costs.

FRANKLIN, C. J., and ROSS, J., concur.

N. B.—Judge CUNNINGHAM being disqualified and announcing his disqualification in open court, the remaining judges, under section 3 of article 6 of the Constitution, called in Hon. A. G. McALISTER, Judge of the Superior Court of the state of Arizona, in and for the county of Graham, to sit with them in the hearing of this cause.