# BINNING v. MILLER, WATER DIVISION SUPERINTENDENT (BAYER ET AL., INTERVENERS)

(No. 2126; April 29, 1940; 102 Pac. (2d) 64)

(Opinion No. 2)

480

For the appellant, there was a brief and oral argument by *J. A. Greenwood* of Cheyenne.

For the respondents, there was a brief by *T. S. Taliaferro, Jr.* and *A. L. Taliaferro* of Rock Springs, and oral argument by *T. S. Taliaferro, Jr.*

BLUME, Justice.

This action was originally brought by Burleigh Binning, hereinafter mentioned by his name or as plaintiff, against David P. Miller, Water Superintendent of Water Division No. 4 of this state, which includes Sublette County, in which the property hereinafter mentioned is situated. The action was brought to enjoin the water superintendent from interfering with a certain dam along so-called Spring Gulch Creek, to prevent him from shutting down the headgates to plaintiff's ditches, and to compel him to regulate the water coming out of a reservoir, called Willow Lake Reservoir, in favor of plaintiff. Charles J. Bayer and William Bayer intervened. Miller agreed in the case to abide by the judgment of the court. The real controversy is between the plaintiff and interveners, and no further reference need be made to Miller, as defendant. The case developed into two independent actions, one relating to the dam on the so-called Spring Gulch Creek and matters incidental thereto, and the other relating to Willow Lake Reservoir and matters incidental thereto. The present opinion, named No. 2, will dispose of the controversy between plaintiff and interveners in reference to Willow Lake Reservoir, leaving the controversy as to Spring Gulch Creek for a separate opinion this day filed.

The matter in dispute herein is the ownership of the reservoir above mentioned, and the dam therefor. It is situated in parts of sections 10, 11, 15-21, T. 35, R. 109. It is located, in a general way, northeasterly of the lands of Binning and the interveners herein. Binning, in his petition, alleged that he is the owner of certain lands; that he has duly adjudicated water rights by direct flow; that he constructed and owns the reservoir in question, which has a capacity of 15,120 acre feet of water. He obtained a permit to construct the reservoir and dam from the state engineer on March 29, 1922; he received certificates of appropriation therefor from the Board of Control of this state on December 30, 1931, part in his own name, part in his wife's name, part in their joint name. William Bayer, the intervener, filed a petition of intervention and an answer. He alleged, in brief—some inconsistency appearing in the two pleadings—that he is the owner of certain lands, with water rights by direct flow; that an agreement was entered into in 1919 between himself, P. W. Jenkins, Glenn Coleman and Charles J. Bayer and the plaintiff Binning, to construct the foregoing reservoir jointly, each to own an interest in proportion to the lands irrigated by the parties from Lake Creek; that it was constructed by the parties, the intervener contributing labor and expense thereto; that thereafter Binning obtained a reservoir permit from the State Engineer, failing to take it out in the name of all the parties interested therein, and obtained the sole right to store water therein; that intervener was excluded from the use of water therefrom in 1931, and that he has been damaged in the sum of $14,000. He prayed that the plaintiff be declared to hold the title to the reservoir in trust for the benefit of all parties interested, and for damages. The intervener Charles J. Bayer alleged that he is a joint owner of the reservoir and that the plaintiff Binning is only entitled to

9,295 acre feet of the water stored therein. He prayed that he be declared to be a part owner. Plaintiff filed what is called a reply to the allegations of the interveners. He alleged that their claims are barred by the statute of frauds; that he expended more than $15,000 in constructing and maintaining the dam and reservoir; that the interveners are guilty of laches and should be declared to be estopped from claiming any interest therein. In his so-called reply to William Bayer, he prayed that if the latter should be decreed to be part owner of the reservoir, then that he be compelled to pay his proportionate part of the expense. A so-called "traverse" was filed to the so-called "replies" of plaintiff, in which the affirmative allegations of plaintiff were denied, and in which the interveners offered to pay their proportionate share of the expense incurred by Binning in the construction of the foregoing dam and reservoir. Some other facts appearing in the pleadings will be mentioned hereinafter. The court held that the parties entered into a joint adventure in 1919 in constructing the reservoir; awarded each of the interveners an interest therein; declined to pass upon the amount which interveners should contribute, because of want of pleading and evidence, and because of absence of parties, but gave any interested party the right to bring in all necessary parties, so that the amount of required contributions, and the definite amount of water to which each interested party would be entitled, might then be ascertained and determined. Further details will be mentioned hereafter. From that judgment the plaintiff has appealed.

1. *The Facts.* In the latter part of 1918 or early part of 1919 the plaintiff Binning and William Bayer and Glenn Coleman had a conversation in connection with the construction of a temporary dam near the outlet of Willow Lake Reservoir, for the purpose of impounding storage water for irrigation. The plaintiff

testified to this conversation and admitted that he asked Bayer and Coleman to help him, although he stated that nothing was said about a partnership. Bayer testified that Binning asked him to get a permit from the U. S. Forest Department; that the talk was that the parties would build a temporary dam, and later a permanent structure; that the parties would build a dam as partners and were each to have an interest in the stored water in proportion to the amount of land which they had under irrigation; that as to the parties who were to have such interest, he mentioned the Smith place, the Decker place, his own place and Coleman's; that the witness asked Binning in 1920 if they had not better file for a "permanent permit"; but that Binning put him off, stated that the times were hard and that they had better put it off for a while. That conversation was denied by Binning, who, on the other hand, testified that he talked with Bayer in the fall of 1921, wanting him to go with him in building a permanent structure, but that Bayer refused. William Bayer further testified that he and Coleman obtained a written, revocable permit from the forestry department, dated January 23, 1919, "for the purpose of construction of temporary log crib and rock dam 6 feet high for the purpose of retarding the flood water for irrigation purposes" at the outlet of Willow Lake immediately below the lake. The permit was in the name of William Bayer and Glenn Coleman, but it was explained that the forest supervisor stated that it made no difference in whose name the permit was. The permit by its terms conferred no right to the use of any water. Glenn Coleman testified that he and Binning and William Bayer had a conversation, or conversations, concerning the building of the dam and obtaining a permit from the forestry department; that Binning stated that "I think we ought to go up and put a dam in the creek to hold back some of the water in the

spring"; that the witness agreed to help build the dam; that some one suggested that other parties should be asked to go in with them, and that the plans for building the dam were talked over. P. W. Jenkins testified that in the latter part of February, 1919, he talked with Henry Oakes, who was working at the Smith place, about the dam and reservoir; "Frequently I talked with William Bayer about it, and I had a conversation at times with Burleigh Binning and various ones interested in the reservoir. * * * The substance was that we were going to build the dam in order to impound the water to use on our land during the short season of the year, and we planned to build a rock cribbing dam * * * to construct the reservoir in the cheapest and most efficient manner. * * * Binning and Bayer were to oversee the work. I never went onto the job. * * * The water was to be divided according to the acreage."

The parties commenced the construction of the dam, made of log cribs and rocks, in February, 1919, Binning doing most of the work, but others helping. William Bayer testified that he with a team worked five days in February, one day in May, 1919, and did some work in 1920; that the value of his work on the dam during the two years is approximately $80.00; that he also helped in hauling rocks, and had a shovel and picks in 1921. He claimed that he helped since 1922, but could not specify any time that he did so except that he had Dan Samora helping in 1927 when the floods threatened to tear out the dam. Glenn Coleman testified that he helped for five days in February, 1919, and had a team and wagon; that he also helped in May, 1919, for one day; in July, 1919, for one day; in the spring of 1920 for one day; he could not tell whether he helped in 1921 or not; but helped in June, 1922, a day or part of a day, and a day and a half in June, 1927, during the flood. A man who represented the A. W. Smith

land helped in February, 1919. Jenkins testified that he sent two men to help in May, for one or two days; that they had teams and some tools; that he sent a man in 1920 for a day and in 1921 for three days; and a man in 1927 for five days. He made an affidavit, evidently after 1927, which he apparently filed with the forestry department, stating that he performed his part of the work in connection with the reservoir during 1919, 1920, 1921 and possibly 1922, and nothing further till 1927; but he testified that he thought he sent one Louis Samora to help in 1924. The latter testified that Binning called him up; that he helped for one day. Binning denied that.

The dam constructed by the parties was a temporary affair and leaky. It consisted, according to Coleman, of two cribs, one 14 feet long and the other 25 feet long, with an opening between, filled with rock and dirt, with the structure 6 feet high, although the height is disputed. Some time during 1922, the plaintiff Binning applied, in his own name, to the State Engineer for a permit to construct a permanent dam. William Bayer and Jenkins testified that they did not know of the permit until a year or so after it was granted, and Jenkins stated that he thought that the application was made for the benefit of all, and that a conveyance of the proportionate interest would thereafter be made by Binning to others interested "according to custom." He did not, however, give any instances of such custom. Binning testified that he tore up the old structure, and built the new structure at about the same place of the old, although he used some or all of the rocks used in the old. Some cement was used. Work was done on the structure from year to year, until, about 1930 or 1931, it ceased to be leaky and held the water. He made proof of his work before the State Engineer in November, 1930. Notice thereof was published on March 12, 1931, in the Pinedale Roundup. Binning was granted

a certificate of appropriation in December, 1931. In the proof submitted by him, he stated that at that time he had expended approximately $8000 on the dam, and he testified that since that time he has spent nearly as much, making his total expenditure over $15,000. Detailed testimony was produced as to the work done on the structure, some workers stating that they labored on the dam for many weeks and even months at a time, during a number of years. Counsel for plaintiff furnished us in his brief with a table showing the detailed work which was done. The table is not seriously disputed, except as to the value. There is testimony to sustain the computation, and we accept it for the purposes of this opinion. It shows that plaintiff's men worked on the dam 1840 days; it shows 1359 "horse days"—days of labor of horses of Binning. That does not include the work done by Binning himself, nor, apparently, does it include the cost of cement and other items. He expended $250 for a surveyor. The table further shows that the total number of days worked by the interveners, Jenkins and Coleman, is 20 days, to which should be added a few "horse days." The witness Baldwin testified that, at the time of the trial, the dam was an earth fill ten feet high, 194 feet long, with a width varying from two to fifteen feet at the top, two to forty-one feet at the bottom, surmounted on both sides, i. e., the water side and the down-stream side, by rip-rapping of rock; that the amount of concrete used was about ninety cubic yards. The witness Binning testified that the length of the dam was 205½ feet, with a width varying from 30 to 45 feet. The evidence does not disclose that the interveners, or Coleman or Jenkins, at any time offered to help, or helped during the time when the permanent structure was erected, or that Binning asked for help, except as already indicated. The interveners and Coleman and Jenkins testified that they had not been paid for their work.

There is testimony that the parties who helped on the dam from 1919 to 1921 or 1922 received storage water from the reservoir up to 1931, but that they did not receive any thereafter. There is quite a little testimony bearing on the question as to who was responsible therefor, but it is not necessary to set that out. Interveners did not ask for any storage water during 1931 and 1932. William Bayer, Charles J. Bayer, and Glenn Coleman were with Binning in May or June, 1931, when Charles J. Bayer stated that the reservoir ought to be, or have been, a cooperative affair. It appears that in 1932 the interveners and others claimed an interest in the reservoir, although they did not directly communicate with Binning. Mrs. Binning testified that she knew that they made some claim, having learned that through a forest ranger. It seems that they made some representations to the forest supervisor, Mr. Favre, and that he had asked for some explanation. In any event the following letter was written on May 14, 1932, on behalf of the plaintiff, evidently signed by Mrs. Binning:

"Dear Mr. Favre: Following is my statement in regard to different points raised in your letter of April 26, to Ranger Shannon and designated as above.

First: I have no actual record of the number of man days of other permittes or myself, of work on the original construction of the temporary dam about 1919 to 1921, but is a fact that during this original construction the men in my employ out numbered the other permittes at least 2 to 1 at any time, and on many occasions, my men were the only ones working on the dam.

As I stated above I have no actual records of the actual amount of work put into the original construction by other permittes, but to the best of my knowledge and belief, the actual work performed by other permittes would not exceed 40 man days. Horsedays for other permittes would not exceed 10 one-horse days.

Balance of the work on the original construction was

performed by myself and men in my employ. Neither do I have an actual record of the amount of this work performed by myself, but to the best of my knowledge and belief it amounted to at least 300 man days and at least 120 team days.

Second. Entire maintenance of dam and gates was left to me during entire time from 1919 to present time with the exception of some work performed in June 1927, when a rat hole under the dirt fill on the south end of the dam caused part of the fill to wash out. Work performed by other permittes besides myself did not exceed 4 man days. Work performed on this break by myself and men amounted to several times the amount performed by other.

Third. All permittes have shared equally with myself in use of stored water ever since temporary dam was first constructed until 1931 and were not refused water then until there was only a small amount of storage water behind the dam, but Jenkins had water. The dam was not filled with water all last year. I have at no time made any charge for water.

If necessary I am satisfied that I can produce witnesses or affidavits to support the above.

Fourth. In view of the above, and the fact that since 1922, I have been sole possessor of State rights for storage water at Willow Lake, I feel that other permittes have been fully compensated for their labor and interest in the original temporary dam, which has since been remodeled and replaced by the present permanent DAM at that location at an expense to me of approximately

If there is any question regarding issuing permit to myself, I want to request a hearing on the matter, at Kemmerer, or Pinedale as one can present proof more satisfactorily than on paper, and to my belief is understood more thoroughly.

I wish to refer you to Mr. L. D. Tanner, Supt. of Water Division No. 4, Big Piney, Wyoming. As I am sure he would willing to give you any information possible.

I have no objection to the permittes adding to the dam, but neither of the three have ever come to me and attempted to make arrangements for same.

In conclusion, WHY, did Bayer, Coleman and Jen-

kins not protest this matter, when it was advertised and I made final proof?

Please give this your careful consideration.

Thanking you.

Sincerely yours,
B. Binning.

Mr. Tanner: Please keep this under cover so P. W. or any of his bunch will get their eyes on it. Is this O. K. do you think?

Thank you.
Mrs. B."

About May or June, 1933, Mr. Barlow, representing Mr. Jenkins, William Bayer and Glenn Coleman were at Binning's house. The parties discussed the probable shortage of water. Coleman testified that he, Bayer and Barlow went to Binning at that time to see if they could make arrangements to get a little more water, but that Binning answered that he had built the dam, had been to a lot of expense and that he didn't feel that he wanted anybody else to use the water, and that when William Bayer asked him if he would accept the proportionate share of expense from the others, he answered that he didn't want to do that. William Bayer, in testifying as to this conversation stated: "We asked him as to some of the storage water, if he would turn loose on it, and he said that he did more work than the rest of us and he figured he owned the water and wouldn't turn loose of any of the storage water. I told him I would be willing and the rest of them, to reimburse him for his additional work."

Prior to the time last mentioned, namely on November 4, 1931, William Bayer, G. A. Coleman, Charles J. Bayer, Allie Bayler and P. W. Jenkins, through T. H. Baldwin, civil engineer, and pursuant to a survey previously made, filed an application with the State Engineer for an enlargement of Willow Lake Reservoir to obtain 3696 acre feet of water to irrigate 1856 acres of land. The application was granted. On May 4, 1933,

William Bayer, one of the interveners herein, filed a statement under oath with the State Engineer requesting an extension of the time for the completion of the enlargement, stating that "the reason this work has not been commenced within the time specified by the State Engineer is that a priority right upon the original reservoir is owned by Burleigh Binning and that his permission for the enlargement has not yet been obtained, and that negotiations for this said permission are in progress and it is expected that the same will be consummated on or before July 7, 1934." Another extension was asked by William Bayer, on behalf of all the applicants on June 1, 1937, for the reason, among others, that "we have been unable to secure a right of way for said dam." In a letter dated June 12, 1935, P. W. Jenkins, William Bayer, Charles J. Bayer, and G. A. Coleman asked the state engineer to inspect Willow Lake Reservoir to determine whether or not it was a safe structure, asking the inspection because of their permit for enlargement, and because such inspection is authorized by Sec. 122-1403, Rev. St. 1931, which provides therefor when the reservoir is owned by a party other than the applicants. Furthermore, in a written notice addressed to plaintiff and his wife, dated September 25, 1935, William Bayer, Charles J. Bayer, Glenn A. Coleman, Perry W. Jenkins, and Allie Bayer asked to purchase water in the reservoir in question, stating among other things: "The undersigned, knowing that you have impounded a greater quantity of water than you can necessarily use for irrigation * * * which surplus water is stored in your reservoir, known as Willow Lake Reservoir, Permit No. 3951, do hereby make application to you to buy said surplus impounded water. * * * We hereby offer and agree to pay you for said surplus water at a reasonable rate, said rate to be fixed by the court. * * * Unless we receive your written assent to said purchase

* * * we will make application to the district court for an order compelling said sale as is provided for in 122-1605 Wyoming Revised Statutes 1931." Apparently the request was not granted and it does not appear whether any application to the court was made. Coleman testified that "we were in need of water, and while we felt that we had a right to this water, we knew we couldn't get it in time to do us any good unless we did this, and we put this up as a temporary proposition." It does not appear that what they "felt" was communicated to Binning.

This outline of the facts clearly shows how exceedingly difficult it is, and must have been for the trial court, to decide what is justice in this case, and it cannot be surprising that the trial court arrived at some conclusions which differ with the conclusions at which we have arrived.

2. *Statute of Frauds.* Counsel for plaintiff Binning contends that the contract entered into by the parties for the construction of the temporary dam is within the statute of frauds and hence is void. Plaintiff pleaded that the claims of the interveners are barred "by section 47-101, fifth paragraph, Wyoming Revised Statutes, 1931, in that said claim of ownership of an interest in said reservoir is not based upon a written agreement or any note or memorandum in writing subscribed by the party to be charged therewith." The fifth paragraph of the statute mentioned refers to "every agreement or contract for the sale of real estate, or the lease thereof, for more than one year." It is apparent that the agreement in this case does not fall within that paragraph. Counsel, doubtless recognizing that fact, now argue that the agreement is void under the first clause of the section of the statute relating to "every agreement that by its terms is not to be performed within one year from the making thereof," and

he argues that the agreement was clearly not to be performed within one year, since it contemplated that the dam was not to be completed within that time, and that in any event it contemplated that it should be held by the parties for an indefinite time. If we admit, without deciding, that the pleading in this case sufficiently called the attention of the court to the statute of frauds and to every part of it, still, we think, that careful consideration will show that the contention of plaintiff on this point cannot be sustained. Suppose that A and B agree, with permission of the Government, to construct a corral and sheds upon vacant land of the United States, for the purpose of housing their sheep during storms. They construct them, or part of them. Who owns them? What right would A have to claim thereafter that he alone is the owner thereof and deprive B of his interest therein? Suppose that A and B agree to jointly construct a ditch on vacant Government land, as they have a right to do, for the conveyance of water therein. They construct it jointly, not, perhaps, of the size and character contemplated, but carrying only a portion of the water which they contemplate to convey through it ultimately when the construction is more perfect. Who owns the ditch? What right has A to attempt to exclude B therefrom? The foregoing shows at once, that consideration must be given not only to the agreement but also to what they have done thereunder, in order to determine whether or not the statute of frauds has any bearing in the case. We can see no particular objection to calling an agreement to construct a reservoir an agreement for a joint adventure, or joint enterprise. However, in a joint adventure the parties, while not necessarily, (O'Brien v. Woldson, 149 Wash. 192, 270 Pac. 304, 62 A. L. R. 436) ordinarily contemplate an enterprise for commercial profit. Hagerman v. Schulte, 349 Ill. 11, 181 N. E. 677. Such a relation may, of course, be created in con-

nection with water rights (Kinney on Irr., 2nd ed., Sec. 1460), but in the case at bar the parties merely meant to acquire ownership of property, not for profit, but for their own individual use. The purchase of property by two or more persons, each of whom contributes a portion of the purchase price, makes them joint owners of the property, but does not, it has been held, establish between them the relation of joint adventurers. 33 C. J. 842. It would seem that the situation is the same if, instead of money, they contribute labor by which they acquire the property. The case at bar seems to fall squarely within the statement of Long on Irrigation (2nd ed.) Sec. 171, where the author states:

"Several persons may together construct or own a dam, headgate or ditch to be used for the diversion or conveyance of water, in which case they are, of course, tenants in common of the dam, headgate or ditch * * * and ordinarily where two or more persons together construct an irrigation ditch, and appropriate water by means of such ditch, they become tenants in common of the ditch and water rights also; the respective quantities of water to which each is entitled being determined by the terms of the contract between the parties, and their mutual rights and obligations being determined by the general law of cotenancy."

In Moss v. Rose, 27 Or. 595, 41 Pac. 666, the court stated: "The ditch having been constructed under an agreement between the parties that each should be entitled to appropriate his share of the waters of Carter Creek, rendered the parties tenants in common of the ditch and the right of appropriation, and the defendants' property rights must be governed by the rules of law regulating such. Black's Porm. Water Rights, 63; Freeman Coten. Sec. 88." See further Biggs v. Irr. Ditch Co., 7 Ariz. 331, 64 Pac. 494; 67 C. J. 1046, 1366; Wiel, Water Rights (3rd ed.) Sec. 320; Kinney on Irr. (2nd ed.) Sec. 1454-1463, and the many

cases cited. And it has further been held that the relative rights of the parties may be fixed by agreement. Long, supra, Sec. 172 and cases cited.

We have not been cited to any cases at all similar to the case at bar where the statute of frauds has been held applicable. It is stated in 27 C. J. 203 that a contract relating to the acquisition of title to vacant or public land is not within the statute of frauds. The contract in the case at bar related to the acquisition of a dam on such land. In Miller v. Rober, 18 Tex. 16, the same section of the statute here urged was urged in that case against the validity of a contract to acquire the ownership of public land. The court stated in part:

"The contract set out in the petition was not a contract for the sale of lands. There was no land, in particular, which was the subject of the contract. It was a contract for the acquisition of land in which at the time there was not any individual proprietorship. It was analogous to the case of one man furnishing another with funds to purchase lands for him or them jointly. Such contract creates a trust which is not within the statute of frauds."

In the case at bar the funds furnished consisted of joint labor. It is stated in 27 C. J. 323 that "when an oral contract not to be performed within one year has been executed by both parties, the validity of the agreement, and of acts done thereunder, cannot thereafter be questioned." Similar in effect is Rorhbaugh v. Mokler, 26 Wyo. 514, 188 Pac. 448. Here work was done, and completed, even though by it only an imperfect dam was constructed. Whatever the completed work was, to that extent at least, the parties became tenants in common and the statute of frauds cannot be invoked to defeat that relationship.

3. *Acquisition of Paramount Title.* The relationship thus created carried with it rights and duties. It is stated in 14 Am. Jur. 78 that "by reason of the com-

munity of interest arising from their co-ownership, the law recognizes that there exists between co-tenants * * * a peculiar relationship of mutual trust and confidence in respect of the common state." Such relationship often requires a man to disregard his own interests, and to look out primarily for the interests of those with whom such relationship exists. That is true with partners, joint adventurers, guardians, trustees and other similar persons. It is the policy of the law that a person so situated should be scrupulously honest. Trice v. Comstock, 121 Fed. 620. While the law does not require it, it permits a cotenant to protect the common interests, and "if he avails himself of the privilege, equity prevents him from using his new title to oppress his cotenants, by regarding it as having been acquired for the benefit of all." 14 Am. Jur. 119. "By reason of the confidential relationship existing between cotenants, the courts agree that it would ordinarily be inequitable to permit one, without the consent of the others, to buy in an outstanding adverse title or claim and assert it for his exclusive benefit, and when such transaction comes before them, they will usually regard the purchasing tenant as holding the title or claim so acquired for the benefit of his cotenants upon seasonable contribution by them of their respective proportions of the necessary expenditure." 14 Am. Jur. 120; see note 6 A. L. R. 297; note 54 A. L. R. 874; Tiffany, Real Property (3rd ed.) Sec. 463. The case at bar does not involve the purchase of an outstanding title, or the payment of any lien. It involves rather the acquisition of an additional, or independent, title, which, in fact, was the sole title. The temporary dam, in and of itself, was of little value, and of little importance. It was constructed under a revocable permit. The matter of importance is the water right. No permit had been obtained from the State Engineer to appropriate water, as is required by the laws of this

state, and no water right was, accordingly, acquired by the construction of the temporary dam. The acquisition of a water right through the permit issued by the State Engineer was an independent right. Does the principle just stated embrace a situation of that character? The matter is one of doubt. It is held in Niday v. Stewart, 42 Tex. Civ. App. 292, 93 S. W. 1027, and Marshburn v. Stewart (Tex. Civ. App.) 295 S. W. 679, that the fiduciary relation of cotenants cannot arise when the title which they hold is not merely defective, but is a nullity. But the contrary is held in Clements v. Cates, 49 Ark. 242, 4 S. W. 776, and Pillow v. Improvement Co., 92 Va. 144, 23 S. E. 32, 53 A. L. R. 804. In the Clements case the court stated:

"Where is the difference between want of title and a defective title? If the outstanding title is paramount to that of the co-tenants, they have in fact no title. To hold, therefore, that those holding as cotenants are only bound by the rule when they have title, is holding that they are bound by it only when it can afford no protection to one against the others; and that they are free to disregard the relationship of trust and confidence the rule was adopted to uphold and encourage, and free to violate the good faith it was intended to inculcate, except when neither can injure the other."

And Freeman on Cotenancy, Section 163, treating of the same subject, states:

"But to say generally that co-grantees are not liable to the restraints imposed on cotenants merely because they obtained no title would be to except out of the general rule those cases in which equitable considerations must imperatively demand its enforcement."

The parties who constructed the temporary dam had at least a possessory right thereto, though the possession was only constructive. A reservoir is impossible without a dam. The new dam was constructed on the site of the old. What right had the plaintiff to appropriate to himself alone the site of this dam and perhaps

part of the old structure? In this case the right acquired by Binning by his permit from the State Engineer was a right granted by the Government of the State, and so it is well to examine cases which have dealt with a similar right. In the case of Gillette v. Gaffney, 3 Colo. 351, two partners received a temporary right—at least a possessory right—to a townsite lot from the judge of probate in Denver. The two partners conducted a business thereon. One of the partners died. Thereafter the surviving partner conveyed a one-half interest in the lot to his brother, George Gillette. The latter perfected his title to this one-half interest by acquiring patent from the United States. It was held that the heirs of the deceased partner could not claim any interest therein. But the court stated: "Had he acquired the title to the half belonging to the heirs as well, equity undoubtedly would have held him as trustee as to that half for the heirs." In Reinhart v. Bradshaw, 19 Nev. 255, 9 Pac. 245, 3 Am. St. Rep. 886; Lytle v. Devlin, 34 Nev. 179, 117 Pac. 15, Ann. Cas. 1914 B. 852, it was held that where two parties are in possession of Government land, one of them who received a patent for the land under the homestead laws, acquired it in trust for both. While these cases are partially based on the rule that a homestead cannot be acquired except on vacant land, the latter case also is partly based on the general rule that one cotenant cannot take advantage of the other. In Mills v. Hart, 24 Colo. 505, 52 Pac. 680; O'Hanlon v. Ruby Gulch Mining Company, 48 Mont. 65, 135 Pac. 913; Furner v. Sawyer, 150 U. S. 578, 14 S. Ct. 195, 37 L. Ed. 1189, a patent to a mining claim, in possession of two persons, obtained by one of them, was held to be acquired for the benefit of both. The United States Supreme Court stated in the case last cited that "it is well settled that cotenants stand in a certain relation to each other of mutual trust and confidence; that neither will

be permitted to act in hostility to the other in reference
to the joint estate; and that a distinct title acquired by
one will inure to the benefit of all." In that connection
we may cite Cedar etc. Min. Co. v. Yarwood, 27 Wash.
271, 67 Pac. 769 and Grant v. Pilgrim, 95 Fed. (2d)
533, which involved the purchase by one cotenant of
an adjoining mining claim which contained the apex
of the lode found in the claim held by the cotenants.
It seems that the owner of a mining claim which con-
tains the apex of a vein of mineral has extra-lateral
rights in that he may follow the mineral vein although
it extends into another claim. Hence in the cases cited
the adjoining claim constituted in a sense a superior
title, and it was held that the purchase thereof inured
to the benefit of the other cotenants, limited in the case
of Grant v. Pilgrim, supra, to the lode the apex of
which was in the claim purchased.

While we are aware of the fact that the case at bar
differs in one vital point from those already cited, in
that the only right to the water ever acquired was
acquired by Binning through his permit and certificate
of appropriation from the state, and that, accordingly,
the case is not at all free from doubt, still we think,
lest we unduly restrict the rule of trust and confidence,
that we should hold, in analogy to the foregoing cases,
that the evidence herein warrants the finding that the
rights acquired by Binning should be held to be ac-
quired partially for the benefit also of William Bayer,
particularly in view of the fact, as testified to by the
latter—and evidently credited by the trial court—that,
at least as between Binning and him, it was contem-
plated that a permanent structure should be erected.
Binning might have obtained for his own use and ben-
efit the rights under the permit of the State Engineer,
if he had repudiated the cotenancy existing at that
time. 62 C. J. 460. He thought, perhaps, that he had
done so when he, as he testified, talked to William Bayer

and asked him to help in the construction of the permanent dam, but when the latter refused. He did not, however, go far enough. It would have been a safer course, in view of the fact that he contemplated large expenditures, if he had sought the advice of counsel, and if he had served a written notice upon his cotenants, which could not have been contradicted. But he did not do so, and we are unable, in view of the rules of law and equity, to extricate him from the perhaps unfortunate situation in which he finds himself by reason of his want of foresight. We should, perhaps, say in that connection that, since the point has not been mooted, and in order that this opinion may not serve as a precedent further than warranted, we have assumed, rather than determined, that the cotenancy should be held to extend to the whole of the new structure, rather than limited to the capacity of the old.

4. *Contribution by Co-Tenants.* The co-tenants, along with rights, have their duties. We may consider the expenses incurred by Binning in connection with the construction of the permanent dam under two aspects. We are not certain that, at least in this case, it would make any difference which aspect is adopted. One of these is to regard that construction as an improvement. Cotenants must contribute their proper proportion toward such improvement, when they have stood by, as they did in this case, and permitted him to proceed to his detriment. 14 Am. Jur. 116-117. That is so much more true, of course, in this case, if as claimed by interveners, the parties contemplated the erection of a permanent structure. However, in view of the fact that the interveners claim that Binning should be considered to hold the paramount title acquired by him from the State Engineer and the Board of Control as trustee, the proper way to consider the expenses incurred by him, at least up to the time when he received his certificate of appropriation, is as an

outlay for the acquisition of such paramount title. In order that the permit granted by the State Engineer might ripen into a title—into a certificate of appropriation—it was necessary to comply with the conditions of the permit and erect a permanent structure which would hold the water. And if Binning is to be held as a trustee, no good reason exists why the general rule should not obtain, namely, that "in granting relief to the cestui que trust as against the trustee, the court should also require that the trustee is reimbursed or indemnified for expenses incurred or advances made by him in the due course of the execution of the trust." 65 C. J. 1072. That accords merely with the rule that he who seeks equity should do equity, and we cannot see equity in an order which grants the cestui que trust relief without simultaneously granting to the trustee the relief to which he is entitled.

Counsel for interveners suggest that some of the items of expense might be barred by the statute of limitations, and that they have had no good opportunity to set up the proper pleading in that connection. The suggestion shows that counsel misconceive the right of their clients. If any limitation of the right of action applies in this case, it is to interveners, not to the plaintiff Binning. Freeman on Cotenancy (2nd ed.) Sec. 156, states:

"The purchase made by a cotenant of an outstanding title or incumbrance is not void, nor does the interest so acquired by him, or any part of it, by operation of law, vest in his cotenants. They may not wish to share in the benefit of his purchase. * * * The law gives them the privilege which they may assert. This privilege consists in the right to obtain a conveyance of the title bought in, upon their paying their share of the price at which it was bought. The privilege may be waived by an express refusal to reimburse the cotenant for his outlay, or by such a course of action as implies such a refusal. The right of a cotenant to share in the benefit of purchase of an outstanding claim is always depend-

ent on his having, within a reasonable time, elected to bear his portion of the expense necessarily incurred in the acquisition of the claim."

The text is approved in Stevens v. Reynolds, 143 Ind. 467, 41 N. E. 931, 52 A. S. R. 422. In the case of Darcey v. Bayne, 105 Md. 365, 66 Atl. 434, 10 L. R. A. N. S. 863, the court states that the right of a cotenant "is a privilege or option and not an obligation, and one which must be exercised within a reasonable time by the cotenant, otherwise be deemed to have repudiated the transaction and abandoned its benefits." In Reed v. Reed, 122 Mich. 77, 80 N. W. 996, 80 A. S. R. 541, the court stated that "before co-tenants can take proceedings to secure the benefit of such purchase by another co-tenant, they must do equity, namely, tender or offer to contribute their proportionate shares of the amount paid in purchase of these outstanding liens * * *. Co-tenants desiring to share in such purchase must move promptly; that is, within a reasonable time." In Steinbeck v. Bonhomme Mining Co., 152 Fed. 333, 343, the court, through Judge Sanborn, stated that "the title of a purchaser chargeable with a constructive trust for the benefit of his correlate by reason of their fiduciary relation is not void but voidable at the option of the cestui que trust only, and in the absence of a prompt affirmative election to avoid it confirms it." In Kershaw v. Simpson, 46 Wash. 313, 89 Pac. 889, the court stated that "appellant, after learning of the purchase price of the property did not tender any portion of the purchase price, although something over three years elapsed from the time she learned of said purchase to the date of the commencement of this action. And since this is an action wherein she invoked equity, it was incumbent upon her to show that she had done equity by paying or promptly offering to pay her portion of the purchase price." The cotenant must, of course, have knowledge of the facts. In this case the

parties interested had such knowledge, not only by the public records, but by direct information conveyed to them. They stood by for years without offering to contribute. See further 14 Am. Jur. 127-129; 62 C. J. 458, 459, 462, 475-476; 65 C. J. 477-478; Gille v. O'Neil, 225 Ala. 92, 142 So. 397; 85 A. L. R. 1526 and note; Buchanan v. Bank, 184 Wash. 185, 50 P. (2d) 520; Terrell v. Terrell, 220 Ky. 717, 295 S. W. 1016; Fiske v. Quint, 274 Mass. 169, 174 N. E. 169; Sattees v. Sattees, 113 W. Va. 708, 169 S. E. 392; note 54 A. L. R. 874-913; Freeman, supra, Sec. 163. In some cases it is held that the cotenant may either be compelled to contribute, or forfeit his interest. But the result would be the same so far as this case is concerned. He has the privilege, but is not compelled to contribute. Slight consideration, then, suggests immediately that to grant an interest in such paramount title to a cotenant, without simultaneously compelling him to contribute his proportionate share, might lead to grave injustice. He might enjoy the benefits thereof for years, receive damages, as he was awarded in the case at bar, and then ultimately determine not to exercise his privilege at all. It might possibly be suggested that in such case he could be compelled to disgorge his ill-gotten gain. That might, but might not, correct the situation. We think that the only just rule in such case is that he should do equity simultaneously with his demand to receive equity. It would seem that a right and privilege here discussed ought not to stand on a much different footing than a right to redeem. Redemption is ordinarily effected only by payment, or the equivalent thereof. See further our discussion herein on the subject of damages.

The court in the case at bar awarded to interveners an interest in the reservoir without at the same time determining the amount which they should contribute. The court found that neither the pleadings nor the evi-

dence was sufficient to determine the amount. However, the plaintiff pleaded that he expended more than $15,000 in constructing and repairing the permanent dam. He further pleaded in the answer to the petition of intervention by William Bayer, that if the latter should be found to have an interest in the reservoir, then that he be compelled to contribute the proper amount of plaintiff's outlay. And plaintiff prayed for general equitable relief in his answer to both petitions for intervention. We think these pleadings were sufficient. In fact we have doubt that it was necessary to go as far as plaintiff did. The interveners should not have relief in equity unless they do equity. That is a substantive rule of equity to the benefit of which the plaintiff was entitled in any event. Of course, the plaintiff was required to advise the court of the amount which he expended. About 50 pages of the record are devoted to testimony on that point. A number of witnesses, some of whom are from other states, were examined and cross-examined. Plaintiff made at least a prima facie case of the amount which he expended. As already stated, the brief of counsel for plaintiff, filed in this court, contains a table showing these expenses. Perhaps they failed to prepare a like table for the trial court, as he should have done, or as it was at least advisable to do. Counsel for interveners argue that this testimony was introduced only for the purpose of showing that there was not a joint adventure. But that does not appear to us to be a reasonable explanation in view of the pleadings of the plaintiff.

The record suggests that interveners have misconceived the amount which they should contribute. They sought to show by Mr. Baldwin, a civil engineer, that the value of the dam is only $3500. But that should not be the measure of contribution. In the first place, repairs and new constructions are frequently necessary in connection with a reservoir. And at least such re-

pair would not be evident at future times of inspection. In the second place, the interveners have an interest in the reservoir, (if any) only as a result of a rule of equity, so that equity should be done on all sides. It would hardly be fair to judge Binning's conduct by any standard different from that which his cotenants deemed fair, and which is, probably, considered fair by farmers generally. If the cotenants in this case had told Binning in plain language that he should go ahead and improve the dam by hiring men and teams, it could hardly be held by the court that they should not pay the fair value of the work done in that manner. That is what they substantially did, if they can be held to be cotenants, and if they, as they claim, always considered themselves as cotenants. They helped in constructing the original dam in exactly that manner. It was their duty to look after the estate of the cotenancy just as much as Binning's. Being neighbors, receiving part of the water in the reservoir, they must have known what Binning was doing, and that he was doing just what they all did in 1919, 1920 and 1921. But they let him do it. They helped in 1927. They received the benefit of the work, in that they received part of the water, without making the slightest objection. They must now be held to be estopped from claiming that the manner of doing the work should have been different, and they must be held to be liable to pay their proportionate share of the cost and expense thus incurred. We are not altogether without authority in analogous situations. Thus it is held that a partner cannot be held responsible for exercising poor judgment in the absence of fraud, culpable negligence or bad faith. 47 C. J. 792. That Binning exercised good faith is altogether probable, if not certain, for he believed that the work was being done for himself alone. No good reason seems to exist why he should be held to a greater responsibility than a partner—in fact interveners claim

that he was a partner, or what is about the same thing, so far as this case is concerned, a joint adventurer.

5. *Bringing in Other Parties.* The court in its decree held that plaintiff and the interveners are jointly interested in the reservoir in question; "that Binning owns a right to use water in proportion to the supply impounded, for 2173 acres; Charles J. Bayar in like proportion, for 120 acres, and William Bayer, in like proportion for 282 acres, and the other joint adventurers own rights in the balance of the water." The interveners were decreed rights accordingly. The court further held that an accounting should be had between all the various joint owners, including others than the interveners, to determine the expenditures in connection with the reservoir, but that the pleadings and proper proof is not before the court to do so, and that any of the parties interested in the reservoir might thereafter file supplemental pleadings and bring in all necessary parties in order to determine the matter. Plaintiff complains of this action of the court, and it is contended that if any other parties are necessary to be brought in, the interveners should have done so.

It may be noted that while the court awarded to the interveners a definite right in the reservoir in relation to the right of Binning, the court failed to determine the total proportionate amount of the stored amount to which either the plaintiff or the interveners are entitled. That total proportionate amount will depend on the amount of water to which other parties are entitled, if any. The amount to which each is entitled will be diminished proportionately when others are admitted. Hence what amount is to be turned out to Binning, how much to the interveners? Nobody knows. This might lead to endless confusion and claims for damages. That this is not a desirable situation is clear. The interveners sued for a definite interest. That definite interest was not awarded them. It would seem to

be clear that with the interveners contending that others had an interest in the reservoir, and with others who were witnesses in the case claiming such interest, the definite amount of water to which the plaintiff and the interveners respectively are entitled could not be definitely settled. Counsel for interveners contend that since one tenant in common may separately sue for his interest in a common property, there was no error on the part of the trial court. But these authorities are not in point; they involve a definite interest, which could be determined without other parties being brought in. But that is not true in the case at bar. It was not the duty of Binning to bring in any new parties. He claimed to be the sole owner of the reservoir. The interveners were the actors, and it was their duty to see that all proper parties were in court. Section 89-521, Rev. St. 1931, provides:

"The court may determine any controversy between the parties before it when it can be done without prejudice to the rights of others, or by saving their rights; but when a determination of the controversy cannot be had without the presence of other parties, the court may order them to be brought in or dismiss the action without prejudice."

We have not found any case in point, but it would seem that when a controversy, supposedly determined, is left in the uncertain condition in which it is left in this case, it must be said that the determination of it cannot be had without the presence of other parties, and that hence the court must either cause other parties to be brought in, or dismiss the action. The court did not pursue either of the methods, and when, accordingly, the interveners failed to cause the other necessary parties to be brought in, the court erred in not dismissing the petitions in intervention.

6. *Awards to Charles J. Bayer.* The court, as already stated, awarded to Charles J. Bayer an interest

in the dam and reservoir in question, to irrigate 120 acres of land. Complaint is made of this ruling of the court on the ground that there is no evidence in the record justifying it. The contention appears to be correct. Charles J. Bayer testified that he knew nothing of the reservoir until 1928, nine years after the agreement to construct; that he was not in the country at the time, but in the service of the United States Government. His statement in 1931, already mentioned, that the reservoir ought to be a co-operative affair shows that he had no interest therein. So far as the record shows, he was not a party to the agreement to construct the reservoir, nor did he contribute anything toward the construction. Surely the little amount contributed by William Bayer can hardly be considered as a part contributed by Charles J. Bayer. Nor is there any evidence to that effect. A party cannot benefit by any enterprise when he contributes nothing toward it. Norton v. Brink, 97 Nebr. 170, 110 N. W. 669; Costello v. Gleeson, 19 Ariz. 532, 172 Pac. 730, 734. Counsel for the interveners have attempted to explain this award, but though we have carefully read what they say on the point, we do not understand them. It is clear that the award here must be set aside. Whether or not it is possible to correct the situation in the further proceedings in this case, we do not know.

We might say in that connection that it appears to be the rule that "in the absence of an agreement to the contrary, joint purchasers of an estate hold shares therein in proportion to their contribution to the purchase price." 62 C. J. 420; Bray v. Clark (Tex. Civ. App.) 9 S. W. (2d) 203. If we apply that rule in this case by analogy, then, since it appears that the parties claiming an interest in the reservoir against Binning contributed but little, the burden to prove the terms of the agreement as to their interest is upon them, and Binning should not be deprived of his right to a greater

extent than is reasonably clearly and satisfactorily established by the evidence. See Caray v. Holbrook, 40 Utah 325, 121 Pac. 572.

7. *Laches, Estoppel, Damages.* The plaintiff pleaded adverse possession for 15 years; that the interveners have been guilty of laches in making their claim and that they should be held to be estopped by their conduct; that they did not within a reasonable time, or at all, pay or offer to pay any of the expenses incurred by the plaintiff in the construction and maintenance of the reservoir. Laches have been defined as delay in enforcing one's right which works disadvantage to another; that it is in the nature of an equitable estoppel. 21 C. J. 211, and note. Some of the cases heretofore cited would seem to indicate that the offer to contribute to the expenses of the construction and maintenance of the reservoir came too late. Other cases would seem to indicate the contrary. A note on the subject is contained in 54 A. L. R. 910-912, to which should be added the late case of Keivman v. Grevers, 122 Conn. 406, 189 Atl. 609, where it was held that "it is the equitable doctrine of laches which cuts off the right of a cotenant to contribute and so retain his share in the property," and that a delay of three years should not be held to be laches in the absence of prejudice to the tenant who redeemed property. In the case of Inman v. Quincy, 128 Ark. 605, 194 S. W. 848, it was held that the rule of laches does not apply if all the cotenants are in possession. We need not, we think, stop to inquire whether such possession existed in the case at bar. In Kent v. Barger, 264 Ill. 59, 105 N. E. 741; Barksdale v. Learard, 112 Miss. 861, 73 So. 861, it is held that delay to contribute for less than the statutory period of limitation in asserting a right to land would not bar the cotenant's right to contribute, unless the delay was accompanied by some element rendering it inequitable to permit the assertion of the right. In the last cited

case the court stated: "Where one co-tenant purchases an outstanding superior title to the common property, he acquires thereby the legal title to the whole of it, but holds such title in trust for the benefit of those of his cotenants who may wish to avail themselves of it by contributing or offering to contribute their proportion of the purchase money. Freeman on Cotenancy (2nd ed.) Secs. 154-156; Smith v. McWhorter, 74 Miss. 400, 20 So. 870; Dickerson v. Weeks, 106 Miss. 804, 64 So. 731. Which right, as between him and his cotenants, will not be barred by mere lapse of time, but only when the delay to assert it is accompanied by circumstances which give rise to an estoppel." We do not think that we can say in this case that the statute of limitations—ten years—applies in this case, for the reason that some of the testimony shows that the cotenants all received part of the water of the reservoir until 1931. See 21 C. J. 221-223. Nor is it clear that the plaintiff Binning changed his position to his detriment, so far as his interest in the reservoir is concerned (aside from the question of damages), by reason of the failure of the cotenants to offer to contribute to his outlay. He might and he might not have expended the amount of work and labor which he actually expended if such offer to contribute had been made seasonably and a claim against him had been asserted. While the question now before us is not free from doubt, we have concluded that we should not hold the claim of the interveners barred.

An altogether different situation presents itself, when we consider the question of damages which were awarded to William Bayer in the sum of $2300, by reason of the failure of the plaintiff to let him have part of the water. It would seem to follow, logically and necessarily, from what we said when we discussed the nature of the right of William Bayer, that such damages should not have been allowed. He had a priv-

ilege or option to contribute or not as he chose. It would seem to be the very nature of an option that one who has it must make the first move, and, as applied in this case, to make the first move when he learned that Binning acquired the title to the dam and reservoir. He learned that soon after the permit was issued. And it must be borne in mind that the only right to the water was acquired by reason of the permit from the state engineer and the certificate of appropriation. The allowance of damages is equivalent to an allowance of a benefit in and to the reservoir, and it would seem to be clear that a cotenant ought not to be awarded such benefit until he himself at least indicates that he wants to do equity. The first step in the exercise of an option which William Bayer had was to offer to pay his proportionate share of the expense. No definite offer, under a claim of ownership, was made until September 1st, 1937, when he filed his reply to the answer to his petition of intervention. But the offer to pay is not sufficient. A cotenant must pay, or offer to pay, when he knows the amount which is due from him, and he ought not to enjoy any benefit in the very property for which he has an option, as in the case at bar, until he does so. In this case Binning rendered a definite account. He showed in detail in the trial of this case, by the examination and cross-examination of witnesses, the expenses which he had incurred. No offer to pay was then made, either the amount claimed by Binning, or an amount which, in the light of the evidence, would be considered reasonable. No effort was then made to do equity. On the contrary, William Bayer is now, in this court, contending that he need not pay at this time, and that the trial court was right in awarding him an interest in the reservoir without determining the amount due; that he has a right to enjoy an interest in the reservoir, putting off the determination of the amount due from him to an indefinite future time,

when, as already indicated, he might find it convenient not to take up his option, let alone that, as urged by plaintiff, he might be found to be insolvent. That does not appear to be just. And if he says that he ought not to be disadvantaged by reason of the refusal of the trial court to determine the amount due, the simple answer to that is, that Binning, too, ought not to be put at a disadvantage. Notwithstanding the action of the trial court, the intervener had it in his power to do, or offer to do, equity. In the case of Fiske v. Quint, 274 Mass. 169, 174 N. E. 196, Frank E. Fiske, a cotenant, paid off a mortgage debt. The court stated: "The payment of the mortgage debt * * * * by Frank E. Fiske, with his own money, operated for the benefit of all the tenants if they should elect to pay their proportional share thereof, and placed the legal title in Frank E. Fiske with the right of possession as against his co-tenants until the amount paid by him and all proper charges above his proportional share were repaid to him." In Hurley v. Hurley, 148 Mass. 444, 19 N. E. 545, 2 L. R. A. 172, the court, speaking through Mr. Justice Holmes, stated that until such payment has been made the cotenant "has no right to the possession of any part of the land, in equity or at law." In Gibson v. Creshore, 5 Pick. 146, 152, the court held that while a cotenant is not compelled to contribute, the cotenant redeeming property is entitled to hold it until he is reimbursed. In Wilmot v. Lathrop, 67 Vt. 671, 32 Atl. 861, the court stated: "It is well understood that a cotenant who redeems the common property from mortgage incumbrance may hold it under the mortgage until the other owners pay him their proportionate share of the money advanced. Hubbard v. Mill Dam Co., 20 Vt. 402. * * * It seems reasonable to hold that an enforced payment of this character by one tenant in common gives him a lien upon the shares of his cotenants to secure his advances, with the right to

retain possession until payment is made. It was so held in Watkins v. Eaton, 30 Me. 529, 50 Am. Dec. 637. See also Hurley v. Hurley, 148 Mass. 444. And while this right of possession exists there can be no partition at the suit of the other cotenants, for partition can be had only by one who is in possession or is entitled to immediate possession." The same general rule as to the right of possession until contribution is made is announced in Aiken v. Galefi 37 N. H. 501; Towle v. Hoyt, 14 N. H. 61; Blodgett v. Hildreth, 90 Mass. 186; 62 C. J. 475. Tiffany on Real Property (3rd ed.) Sec. 466, states: "The cotenants entitled to the benefit of the rule (that he may contribute) must, within a reasonable time, having due regard to their knowledge or means of knowledge of the purchase (of an outstanding title), contribute or offer to contribute their proportion of the price paid, and a failure so to do will be regarded as a repudiation of the transaction and abandonment of its benefits, and likewise, until this is done, they cannot demand partition. On the payment of a mortgage by one cotenant, he has the right of possession against his cotenants until they repay him." If, then, as held by the foregoing authorities, William Bayer did not have the right of possession of the water in question here "either in equity or at law" until he made contribution, as stated by Mr. Justice Holmes, then, clearly, he was not, in the absence of contribution, entitled to any damages when he did not get such possession. The application of the rule seems to be more cogent in the case at bar than in the ordinary case for the reason that if any damages would accrue, they would accrue by reason of the withholding of the very property—the water right—which constitutes, in part at least, the paramount title acquired by Binning. Careful consideration of the facts in this case might have led to caution in this connection, namely, it would, on its face, seem to be rather harsh that William Bayer,

for the expenditure of a mere pittance, perhaps $100, as against the expenditure of thousands of dollars by Binning, should not alone have the benefit of valuable water for the period of twelve years, but should in addition recover from Binning damages in the sum of $2300. If justified at all, it would only be because the ways of the transgressor are hard. But it is not at all clear that all the blame should be laid at Binning's door.

Aside from what has been stated, on September 25, 1935, the interveners and other parties who now claim an interest in the reservoir addressed a communication to the plaintiff Binning, recognizing that the latter was the sole owner of the reservoir in question and offering to buy some of the water. The communication was not qualified in any way. We cannot conceive of a more glaringly contradictory position than to tell Binning that he was the sole owner, and subsequently sue him for damages because he was not and because the representation made to him was false. If the communication sent to Binning did not mislead him, it was not the fault of those who sent it. It would seem that they should not be, at least without a clear excuse, which does not exist in this case, permitted to thus shift their position. It would seem to be unconscionable to allow them to thus blow hot at one moment and blow cold the next. At least no damages which are claimed to have accrued between the date of communication and the filing of the petition of intervention, should be allowed under such facts. And independent factors exist which lead to the same result as to damages accruing previous to that time. In the fall of 1930 notice was published in the Pinedale Roundup that Binning would prove up on his claim in the reservoir. It is probable, in a small community like Pinedale, that William Bayer saw that notice. At least he did not testify that he did not see it. From that time on William Bayer's conduct

was consistent only with the fact that the sole right in the reservoir was in the plaintiff. In May or June, 1931, Charles J. Bayer, in the presence of William Bayer and Glenn Coleman, stated that the reservoir ought to be a co-operative affair, recognizing the fact that it was not. There was a dispute then about shortage of water; the indications are, that the parties talked about the ownership of the reservoir and that plaintiff claimed that he alone owned it. If William Bayer claimed to own a part of it, it was his duty to speak. He did not do so. On the contrary, during the same year, he caused a survey to be made and made an application, along with others, to enlarge the reservoir. It is not clear whether Binning knew of this or not, but since it appears that William Bayer and his associates attempted to get the right from Binning to make the enlargement, we may infer that the latter knew of the application. In 1932 Mrs. Binning heard that William Bayer and others claimed an interest in the reservoir. But the parties did not go to Binning as they should have done, if they claimed co-ownership, nor did they communicate their claim directly. It was a forest ranger through whom Mrs. Binning learned of the claim. About May, 1933, William Bayer and others had another talk with Binning during which the latter claimed the sole ownership of the reservoir. William Bayer then offered to pay his proportionate part of the cost. But he did not claim that he was part owner, but apparently made the offer on the theory that the reservoir ought to be made a co-operative affair. It was in the nature of an offer to purchase an interest therein. It can hardly be claimed that he intimated that he was part owner, for about the same time he made a statement under oath, conceding that Binning alone was the owner. Again, on June 12, 1935, both the interveners, P. W. Jenkins and Glenn Coleman addressed a communication to the State Engineer to have the dam in

question inspected in accordance with the provisions of Section 122-1403, Rev. St. 1931. That statute seems to contemplate that the inspection may, for their protection, be made at the request of parties who are not the owners of the dam or reservoir, and compelling the owner, when the inspection is justified, to pay the expenses thereof. Here, then, was again a clear recognition that Binning was sole owner of the reservoir. Thus we see that substantially up to the time when the petitions of intervention were filed herein Binning was treated as the sole owner. Surely the court cannot be asked to treat these overwhelming facts lightly and brush them aside. It would seem that we have gone far enough, and perhaps too far, when we hold, in face of these facts, that, in view of the trial court's finding, the cotenancy, at least as to William Bayer, should be held to extend to the new structure. It would seem to be clear that in view of the fact that damages, if due at all, would accrue and continue to accrue by reason of scarcity of water, William Bayer should have made his claim to his interest in the reservoir promptly, and not permit Binning to slumber in the belief that he was sole owner. It can scarcely be claimed that Binning was entirely unjustified in his conduct. The very admissions of interveners contradict such claim. Furthermore, the interveners and others who claim an interest in the reservoir paid no attention to it and permitted Binning to spend thousands of dollars in the attempt to make it water-tight. That conduct is inconsistent with the claim that they are part owners. We cannot lay too much stress upon the help rendered to Binning in June, 1927. It was rendered during an emergency. It may well be considered as a merely neighborly act. The work which Binning did during many years was not merely ordinary work of repair, which might excuse the inattention of others interested in the dam. The dam first constructed was leaky and

inadequate, and the work which was done by Binning was work of construction and of enlargement, and was known or should have been known as work essential to be done in view of the fact that Binning was known to have a permit from the State Engineer. And if interveners and others interested in the dam as against Binning believed and continued to believe that they were interested in the dam and reservoir, then, when they sat by complacently and permitted Binning to bear all the burdens, they placed themselves in a situation in which they should be entitled to recover only in so far as well settled rules of law and equity, and rules and principles in analogy thereto, require. The recovery of damages herein by William Bayer does not fall within such rules. He should, aside from what has previously been stated, be held to be guilty of laches in not asserting his rights sooner, and the award for such damages must be set aside. The point seems so clear that it would seem useless to relitigate it.

The judgment as to the damages is accordingly reversed and set aside. The judgments as to the rights of interveners in and to the reservoir are reversed, and we think that it would be best to make the following order as to what should be done with reference thereto in the future, namely, that the cause is remanded to the district court with direction that, if the interveners shall not, within a reasonable time, cause to be brought into the case the other parties interested in the reservoir in question, the petitions of intervention should be dismissed, unless the court, on its own motion, prefers to have these parties brought in. If the parties are brought in, then the court should proceed to ascertain and determine the rights which the respective parties have in and to the reservoir in question, if any, and ascertain and determine the amount of contribution which they should make to the outlay and expenses made by the plaintiff Binning, fixing a reasonable time

within which payment to Binning shall be made, and directing that, unless such payment is so made, the respective parties not making it shall have no interest in and to the reservoir, and that such other and further proceedings be had which are not inconsistent with this opinion. It is accordingly so ordered. It would seem that if the other parties interested are brought into the case, it would be advisable in the interest of all, that the evidence already submitted be used in so far as feasible, permitting the parties, however, to introduce further testimony, substitutional or additional, as they may deem advisable, and if the parties not now in the case should object to the testimony already introduced as testimony in the case against them, the court, and the parties now in the case, doubtless will find some way in which the testimony may be used as far as may be proper and at the same time give the parties not now in the case the right to a hearing in accordance with constitutional rights.

The costs on this appeal should be assessed as follows: ⅔ to interveners, ⅓ to plaintiff, with no costs taxed for the briefs.

*Reversed and remanded, with directions.*

RINER, Ch. J., and KIMBALL, J., concur.